UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| EVERADO CARRILLO, ET AL., | ) | Case No. CV 11-8557 CAS (DTBx) |
| Plaintiffs, | ) | |
| | ) | **ORDER GRANTING PLAINTIFFS'** |
| vs. | ) | **MOTIONS FOR PRELIMINARY** |
| | ) | **INJUNCTION, PROVISIONAL** |
| | ) | **CLASS CERTIFICATION AND** |
| SCHNEIDER LOGISTICS, INC., ET | ) | **APPROVAL OF HOFFMAN-LA** |
| AL.; | ) | **ROCHE NOTICE** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## I.    INTRODUCTION

On October 17, 2011, plaintiffs Everardo Carrillo et al., employees at the Mira Loma warehouse facility in Mira Loma, California, filed suit against Schneider Logistics, Inc. ("SLI"), Premier Warehousing Ventures, LLC ("PWV"), Rogers-Premier Unloading Services, LLC ("Rogers-Premier"), and Impact Logistics, Inc. ("Impact") alleging violations of the California Labor Code and the Federal Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA").  Specifically, plaintiffs allege improper recordkeeping, inadequate payment for hours worked including overtime, and failure to provide meal and rest breaks as required by law.  On October 28, 2011, plaintiffs filed their first Amended Complaint ("FAC") adding Schneider Logistics Transloading and

Distribution, Inc. ("SLTD").[1]

The Court issued a temporary restraining order ("TRO") dated October 31, 2011 against Premier and Impact imposing requirements for issuing corrected wage statements. Dkt. No. 43. The Court ordered all defendants to show cause on November 9, 2011 ("November 9 Hearing"), why they should not be restrained and enjoined by a preliminary injunction pending trial as described in the TRO. On December 7, 2011, the Court granted a preliminary injunction against all defendants requiring them to keep accurate records and to abide by the requirements of state and federal labor laws. Dkt. No. 106.

On December 22, 2011, plaintiffs filed a motion for preliminary injunction seeking to enjoin an allegedly retaliatory mass firing of workers and for provisional class certification. On December 29, 2011, plaintiffs filed a motion for approval of notice pursuant to Hoffman-La Roche v. Sperling, 493 U.S. 165 (1989). Schneider filed its opposition to plaintiffs' motion for preliminary injunction on January 3, 2012. Premier filed a separate opposition to plaintiffs' motion on January 3, 2012. Schneider, Premier, and Impact filed separate oppositions to plaintiffs' motion for approval of Hoffman-La Roche notice on January 9, 2012. Plaintiffs filed their reply in support of their motion for approval of Hoffman-La Roche notice on January 13, 2012. Plaintiffs filed their reply in support of their motion for preliminary injunction on January 20, 2011. With leave of the Court, on January 26, 2012, Schneider filed a sur-reply in opposition to plaintiffs' motion for preliminary injunction. A hearing was held on January 30, 2011. After carefully considering the parties' arguments, the Court finds and concludes as follows.

///

///

---

[1] The Court refers to PWV and Rogers-Premier collectively as "Premier" and SLTD and SLI collectively as "Schneider."

## II.      DISCUSSION

### A.      Plaintiffs' Motion for Preliminary Injunction

#### 1.      Background

In the Spring of 2011, Schneider and Premier entered into a two-year service contract, effective April 15, 2011, under which Premier would provide "trailer loading services" for Schneider at three warehouses in Mira Loma, California.  See Traber Decl. Ex. A §§ 1.01, 4.01.  The contract required Premier to provide enough workers to satisfy Schneider's fluctuating needs for semi-truck trailer loading.  Id. § 2.01. Schneider agreed to pay Premier a fixed amount for each fully-loaded truck.  Id.  In finding that Schneider should be subject to the preliminary injunction requiring proper recordkeeping, the Court previously determined that Schneider's contract with Premier dictates nearly every material term of plaintiffs' employment for example, by requiring each new worker to undergo detailed pre-employment screening and training, providing ongoing supervision, and requiring accurate recording of all hours worked, periodic performance evaluations, and strict adherence to Schneider's performance standards. Dkt. No. 106 at 5; Traber Decl. Ex. A §§ 2.04(a)-(p), 2.08.  Schneider also reserved the right to request that Premier remove any worker from the premises and from their assignment with Schneider.  Traber Decl. Ex. A § 2.12.  The contract purports to shift all responsibility for legal compliance to Premier, declaring that Premier shall be "solely responsible" and will "remain the sole and exclusive employer" of the workers. Id. §§ 2.02–2.03.

On October 12, 2011, the California Division of Labor Standards Enforcement ("DLSE") conducted an unannounced inspection of the warehouses during which investigators uncovered significant recordkeeping violations for which administrative citations were issued.  As noted above, plaintiffs filed this class action lawsuit on October 17, 2011, seeking injunctive relief and damages against all defendants.  On October 18, 2011, the named plaintiffs and others held a press conference and a public meeting to announce the filing of this lawsuit.  Ramirez Decl. ¶ 4.  On October 19,

2011, plaintiffs and others publicly demonstrated outside the warehouses and distributed leaflets depicting some of the workers supporting this lawsuit. Ramirez Decl. ¶ 5; Arcero Decl. ¶ 7; Tejada Decl. ¶ 7. Later that day, Schneider's management called a mandatory meeting of about 25 employees.[2]

On October 21, 2011, Premier sent a letter to Schneider stating that Premier "had come to believe" that it was "unable to sustain its work" under "the present terms" of the contract. Redgrave Decl. Ex. A. However, the letter stated that Premier would "be glad to discuss new arrangements." Id. Premier indicated that it would also be terminating contracts with Schneider in Savannah, Georgia and Elwood, Illinois. Id. Thereafter, on November 18, Premier held a meeting of its workers at the Mira Loma facility at which it distributed a termination letter, giving notice to workers that they would be "separated from employment with Premier on or about February 24, 2012." Supp. Lopez Decl. ¶ 4 & Ex. A. Premier also stated at the meeting that it would not rehire any of the workers. Id. ¶ 5. Plaintiffs maintain that "retaliatory intent is the only explanation" for Premier's cancellation of the contract and the mass termination of plaintiffs. Mot. at 9.

///

///

///

---

[2] The parties dispute the purpose of and what was said at the meeting. According to plaintiffs, Schneider Assistant General Manager Mark Hedges expressed anger that workers had filed this suit and had named Schneider as a defendant. Quezada Decl. ¶ 7; Ramirez Decl. ¶ 6. Plaintiffs assert that Hedges physically mimed the crumpling and throwing away of a piece of paper, and told the workers that anyone who supported the workers' efforts would be "destroyed" and "thrown away." Id. According to Schneider, Mark Hedges informed employees that DLSE had cited impact for improper recordkeeping and that Schneider was not under investigation but was named in the current action. Hedges Decl. ¶¶ 3, 5; Gonzalez Decl. ¶¶ 3–5; Davis Decl. ¶¶ 3–5. Schneider asserts that at no time during the meeting did Hedges make any statements that could be construed as threatening. Hedges Decl. ¶ 6; Gonzalez Decl. ¶ 7; Davis Decl. ¶ 6.

1

### 2.     Legal Standard

A preliminary injunction is an "extraordinary remedy." <u>Winter v. Natural Res.
Def. Council, Inc.</u>, 555 U.S. 7, 9 (2008).  The Ninth Circuit summarized the Supreme
Court's clarification of the standard for granting preliminary injunctions in <u>Winter</u> as
follows: "[a] plaintiff seeking a preliminary injunction must establish that he is likely to
succeed on the merits, that he is likely to suffer irreparable harm in the absence of
preliminary relief, that the balance of equities tips in his favor, and that an injunction is
in the public interest." <u>Am. Trucking Ass'n, Inc. v. City of Los Angeles</u>, 559 F.3d
1046, 1052 (9th Cir. 2009); <u>see also</u> <u>Cal. Pharms. Ass'n v. Maxwell-Jolly</u>, 563 F.3d
847, 849 (9th Cir. 2009) ("<u>Cal. Pharms. I</u>").  Alternatively, "'serious questions going to
the merits' and a hardship balance that tips sharply towards the plaintiff can support
issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable
injury and that the injunction is in the public interest." <u>Alliance for the Wild Rockies v.
Cottrell</u>, 632 F.3d 1127, 1132 (9th Cir. 2011); <u>see also</u> <u>Indep. Living Ctr. of So. Cal. v.
Maxwell-Jolly</u>, 572 F. 3d 644, 657–58 (9th Cir. 2009) ("<u>ILC II</u>").  A "serious question"
is one on which the movant "has a fair chance of success on the merits." <u>Sierra On-
Line, Inc. v. Phoenix Software, Inc.</u>, 739 F.2d 1415, 1421 (9th Cir. 1984).

### 3.     Analysis

For the reasons articulated below, the Court finds it reasonable and necessary to
enjoin the impending February 24, 2012 termination of workers at the Mira Loma
warehouse facility.

### a.     Likelihood of success on the merits

The Court finds it likely that plaintiffs will prevail on their claim for retaliatory
termination in violation of federal and state law.

The FSLA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), broadly prohibits
any person from retaliating against any worker or group of workers who have filed
complaints concerning violations of the FLSA. <u>Kasten v. St. Gobain</u>, 131 S.Ct. 1325
(2010).  That provision states, in pertinent part:

[I]t shall be unlawful for any person . . . (3) to discharge or in any other

manner discriminate against any employee because such employee has

filed any complaint or instituted or caused to be instituted any proceeding

under or related to this chapter . . . .

Equally broad anti-retaliation provisions are set forth in the California Labor Code, which prohibit any "discharge" or "any manner [of] discrim[ination]" against any workers who make complaints and public filings. See Labor Code § 98.6(a); see also Labor Code § 1102.5(b) ("An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.").

Schneider contends that plaintiffs are not likely to succeed on the merits for multiple reasons. First, Schneider argues that plaintiffs cannot present any facts to show that it participated in or influenced Premier's decision to terminate the agreement to provide services at the Mira Loma warehouses. Opp'n at 8. Next, Schneider contends that an employment action that similarly impacts all like-situated employees, as opposed to targeting specific employees, cannot be shown to be an adverse action within the meaning of the FLSA. Id. at 8–9 (citing Weger v. City of Ladue, 500 F.3d 710 (8th Cir. 2008); Somoza v. Univ. of Denver, 513 F.3d 1206 (10th Cir. 2008); Jordan v. Chertoff, 224 Fed. Appx. 499, 501 (7th Cir. 2007). Accordingly, because Premier terminated its contracts in two locations in addition to Mira Loma, Schneider maintains that there has been no adverse action taken against plaintiffs. Id. at 9. Next, Schneider argues that plaintiffs have proffered insufficient evidence to establish that Schneider had a retaliatory motive against plaintiffs. Schneider further contends that, contrary to plaintiffs' "false" allegations, Schneider supervisors do not have the authority to discipline or fire the workers, and have never been told that they have such authority. Id. at 11 (citing Arroyo Decl. ¶ 5; Arauz Decl. ¶ 3. Thus, Schneider argues

that even if plaintiffs could establish a prima facie case of retaliation against Premier, plaintiffs cannot do so with respect to Schneider because Schneider is not a joint employer of plaintiffs.  Id. at 13.

Additionally, Schneider and Premier each argues that plaintiffs are unlikely to prevail on the merits because it is beyond the scope of the Court's authority to provide the type of relief plaintiffs request.  Both defendants cite Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 398 (1920), and Bullock v. State of Florida, 254 U.S. 513, 518 (1921) for the proposition that a court may not enjoin the termination of a contact, where the effect is to require a business to continue its operations. Schneider Opp'n at 12; Premier Opp'n at 7–9.  Finally, Schneider argues that courts may not enjoin the termination of employees.  Schneider Opp'n at 12–13 (citing Reid Ice Cream Co. v. Stephens, 62 Ill. App. 334 (Ill. 1896); Auberach v. Northland Rubber Co., 161 N.Y. Sup.. 396 (N.Y. 1916); Brook v. Riley, 3 N.Y.S. 446 (N.Y. 1888).

### i.   Whether Schneider is a joint employer of plaintiffs

The Court rejects Schneider's argument that it cannot be subject to a preliminary injunction enjoining the February 24 termination because it is not a joint employer of plaintiffs.  All joint employers are jointly and severally responsible for compliance with the FLSA, including its anti-retaliation provisions.  See Chao v. A-One, 346 F.3d at 916–19 (affirming that companies were joint employers and liable for retaliatory discharges); Chao v. Hoel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007) ("There may be multiple employers who are simultaneously liable for compliance with the FLSA.").  In order to establish that Schneider is a joint employer with Premier, plaintiffs must demonstrate that Schneider "directly or indirectly, or through an agent or any other person, employs or exercises control" over plaintiffs' wages, hours or working conditions.  IWC Wage Order §9-2001 §2(G); Martinez v. Combs, 49 Cal.4th 35, 64, 69 (2010); Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947); Boucher v. Shaw, 572 F.3d 1087, 1091 (9th Cir. 2009).  Plaintiffs have offered substantial evidence

that Schneider both indirectly and directly controls their working conditions. This evidence includes: (1) declarations from workers that supervisors from both Schneider and Premier disciplined them, terminated them, and directed them how to do their work; and (2) the 2011–13 labor services contract between Schneider and Premier, which the Court has already found gives Schneider contractual authority to control almost every material term and condition of the workers' employment. <u>See</u> Dkt Nos. 64, 65, 67, 70, 71, 72, 93 & Ex. A attached thereto; Prelim. Inj. at 5.[3]  Based on this evidence, the Court believes that plaintiffs are likely to prevail on their assertions that Schneider is a joint employer with Premier and that each is jointly and severally liable for the actions of the other.

///

///

---

[3] Schneider's attempt to rebut plaintiffs' evidence is unpersuasive. First, rather than directly address plaintiffs' specific allegations, the declarations from Schneider managers only broadly and conclusorily state that Schneider has never supervised, directed, controlled, or terminated any of the workers. Doc. 133 at 4–6.  Schneider's General Manager, Vincent Redgrave, admitted in his deposition that he did not know what Schneider supervisors did on a day-to-day basis. Redgrave Depo. at 54:14–21.  He also testified that neither he, nor anyone else at Schneider, conducted any investigation of whether Schneider supervisors exercised control over plaintiffs' employment or daily work activities. <u>Id.</u> at 61:8–62:11. Moreover, although Redgrave asserted in his declaration that there are no supervisors at the Mira Loma warehouses with the names plaintiffs identified, Redgrave Decl. ¶ 3, he conceded in his deposition that plaintiffs accurately identified Schneider supervisory personnel whom he characterized as "leads." Redgrave Depo. at 176:7–180:24. Mark Hedges, Schneider's Assistant General Manager, explained that the personnel whom Schneider now calls "leads," it previously called "supervisors." Hedges Depo. at 17:6–9. Further, Schneider's denials that any of its personnel ever supervised any plaintiffs working in the Mira Loma warehouses is also directly refuted by the declaration of Ramon Cepeda, a former Impact supervisor, who explains in detail exactly how Schneider's managers controlled and directed plaintiffs' work. Cepeda Decl. ¶¶ 2–10. According to Cepeda, Schneider management set the controlling productivity standards, directed subcontractors to have their personnel under-report the workers' actual hours, and specifically told him on several occasions to terminate particular employees. <u>Id.</u> ¶¶ 4–6.

**ii.    The Court's authority to grant a preliminary injunction to enjoin the termination**

Notwithstanding the cases cited by the defendants, it is undeniably within the Court's authority to grant the type of relief that plaintiffs request.  Regardless of a court's power to enjoin an employee's termination as it existed at common law at the turn of the nineteenth century, this case involves a claim for wrongful statutory retaliation under the FLSA and the California Labor Code, which explicitly authorize the grant of injunctive relief for the wrongful conduct plaintiffs allege here.  As Congress expressly provided in the FLSA:

> Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or *equitable relief* as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation, *employment reinstatement*, . . .

29 U.S.C. § 216(b) (emphasis added); see also Bailey v. Gulf Coast Transp., Inc., 280 F.3d 1333, 1337 (11th Cir. 2002) (affirming preliminary injunction where district court "put the employee back in the position he held before the employer's retaliatory conduct").  Similarly, the Lochner-era cases upon which defendants rely do not preclude the Court from determining that a contract otherwise terminable for a lawful reason cannot be terminated for on the basis of unlawful retaliation.[4]  See Lochner v.

---

[4]  In any event, in issuing this injunction, the Court does not require the reinstatement of Premier's labor contract with Schneider.  Instead, the Court merely preserves the status quo by enjoining the defendants from carrying out the planned February 24, 2012 mass terminations.  While defendants could comply with the terms of this injunction by reinstating the service contract, Schneider could also comply by retaining the workers directly or otherwise.  For this reason, defendants' argument that this injunction constitutes a "mandatory injunction" subject to a heightened standard is unavailing.  Nevertheless, even if this injunction could be construed to be a "mandatory injunction," the Court finds that the facts of this case clearly favor plaintiffs, and therefore that an injunction would be appropriate even when evaluated under the "heightened" (continued...)

1  New York, 198 U.S. 45 (1905).

2                     **iii.   Causal link between protected activity and**

3                            **termination**

4        The Court finds it likely that plaintiffs can establish a causal link between their

5  protected activity and their impending termination.  Under both state and federal law,

6  plaintiffs may prove causation by showing that retaliation was a substantial or

7  motivating factor for defendants' adverse employment actions.  Ostad v. Or. Health

8  Scis. Univ. 372 F.3d 876, 884 (9th Cir. 2003); George v. Cal. Unemployment Ins.

9  Appeals Bd., 179 Cal.App.4th 1475, 1492 (Cal. Ct. App. 2009).  Plaintiffs can satisfy

10  this standard in a variety of ways, including by showing temporal proximity between

11  the protected activity and the adverse action, through statements by the employer

12  showing its disapproval of the protected activity, and by showing that the employer's

13  proffered reasons for the adverse action were pretextual.  Coszalter v. City of Salem,

14  320 F.3d 968, 977 (9th Cir. 2003).  In this case, plaintiffs can likely show all three.

15        First, there is close temporal proximity between the DLSE inspection, the filing

16  of this lawsuit, and the mass termination.  Premier terminated its contract with

17  Schneider on October 21, 2011, only nine days after the DLSE inspection, and only four

18  days after plaintiffs filed this lawsuit.  Based on such close temporal proximity, the

19  Court believes it likely that the mass termination was retaliatory.  See Thomas v. City of

20  Beaverton, 379 F.3d 802, 812 (9th Cir. 2004) ("The causal link between a protected

21  activity and the alleged retaliatory action can be inferred from timing alone when there

22

23

24  ────────────────

25      [4](...continued)

26  standard applicable to mandatory injunctions. See Schwarzer, Tashima & Wagstaffe, Cal. Practice Guide: Fed. Civ. Pro. Before Trial (The Rutter Group 2011), ¶ 13.795. Moreover,

27  as noted above, the FLSA permits the issuance of "mandatory" injunctions as it specifically provides that a court may require "employee reinstatement." 29 U.S.C. §

28  216(b).

1   is a close proximity between the two.").[5]

2   Next, the Court believes it likely that plaintiffs can show retaliatory motive

3   through Schneider's statements and conduct, which demonstrate its disapproval of

4   plaintiffs' protected activity.  The Court finds plaintiffs' version of the events of

5   October 19, 2011, more credible than Schneider's for three reasons.  First, the two

6   employees who testified that Mark Hedges threatened to "destroy" or "throw away"

7   anyone who supported this lawsuit do not stand to gain through this testimony because

8   they are not plaintiffs or potential class members.  By contrast, Hedges is a member of

9   Schneider's management team, with a clear job-related bias.  Second, Hedges admitted

10  in his deposition that Schneider was displeased with the support for the plaintiff

11  workers shown by Schneider employees Franklin Quezada and Victor Ramirez.[6]  Third,

12  Schneider has refused to produce the actual videotape of the October 19 meeting, to

13  which Hedges acknowledged that Schneider has access.  Schneider's refusal to produce

14  the videotape raises the inference that plaintiffs' characterization of what Hedges said at

15

16  ───────────────

17      [5] In this regard, Schneider's reliance on <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885,

18  895 (9th Cir. 2005), for the proposition that causation cannot be shown by temporal
    proximity is misplaced.  In that case, the Ninth Circuit held that a trial court erred in

19  granting summary judgement to an employer on a retaliation claim based on the two-year
    delay between the protected conduct and the adverse action. Rejecting the argument that

20  temporal proximity is *necessary* to show causation, the court noted that a large gap may
    make it more difficult to prove causation but does not prevent such a showing. Indeed, the

21  <u>Porter</u> court noted: "The cases that accept mere temporal proximity between an employer's

22  knowledge of protected activity and an adverse employment action as sufficient evidence
    of causality to establish a prima facie case uniformly hold that the temporal proximity must

23  be 'very close.'" <u>Id.</u> at 895 (quoting <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273

24  (2001)).

25      [6] Hedges testified that when he and others in Schneider management saw that two

26  employees were pictured on a flyer distributed by Warehouse Workers United supporting
    the lawsuit, he and other members of management expressed concerns because "naturally,

27  our company doesn't want to have a union.  We're pro management."  Hedges Depo. at

28  46:6–22.

the meeting is accurate, and that Schneider's characterization is not.  See Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991) (adverse inference when party fails to produce relevant evidence within its control).

Third, the Court finds that plaintiffs will likely be able to show that defendants' excuses for the termination are pretextual.  In reaching this conclusion, the Court finds that Schneider has failed to offer a legitimate reason for its refusal to maintain the workers after February 24, 2012, despite considerable evidence demonstrating that the work those employees are now performing will still need to be done after that date, and that hiring an entirely new workforce to replace plaintiffs appears contrary to Schneider's economic self-interest.[7]  Furthermore, the Court does not believe Schneider has adequately explained its departure from past practices in this case.  That is, while Scott Larson testified that it was his general practice, as Schneider's purchasing agent and chief contract negotiator, to respond to all notices of contract termination, in this case, Schneider accepted the October 21 termination letter without attempting negotiation.[8]  In any event, even if Schneider continues to subcontract loading work to another company such as RoadLink, Schneider has not offered a logical explanation for its failure to retain the experienced workers that have already been trained and vetted by

_____

[7] The Court notes that Schneider is still responsible under a contract with Wal-Mart for loading and unloading the same number of trucks at the Mira Loma warehouses. Redgrave Depo. at 38:24–39:10, 143:14–19.  Indeed, Schneider has already negotiated contract terms with a different company, RoadLink Workforce Solutions, LLC ("RoadLink"), to take over Premier's work after February 24, 2012. However, Schneider's purchasing agent and chief contract negotiator, Scott Larson, conceded that it would be more efficient for Schneider to retain, rather than terminate, incumbent subcontractors that are familiar with their contract responsibilities and that have an experienced and vetted workforce in place.  Larson Depo. at 37:6–18.

[8] The Court finds particularly significant that Schneider never offered Premier the higher contract rates it eventually agreed to with RoadLink, despite Premier's offer to "discuss other arrangements."  Redgrave Decl. Ex. A.

Premier.[9]  Premier's stated reasons for cancelling the contract thereby causing plaintiffs'
termination also appear to be pretextual.  In his declaration, Premier's owner, Jim
Pittman, states that Premier decided to terminate the contract because he learned in
August or September 2011 that Premier's workers' compensation costs in California
could more than double.  Pittman Decl. ¶¶ 6, 8.  However, Pittman has not satisfactorily
explained why he waited until October 21 to terminate the contract—i.e., four days after
plaintiffs filed this lawsuit—when he knew since at least September about the insurance
increase.  While Pittman claims that he was traveling on business in September and
October and needed time to look at Premier's contracts with Schneider, he admitted in
his deposition that he had staff who could have pulled the contracts for him, and that it
would have taken less than 30 minutes to review them.  Pittman Depo. at 63:9–67:20.[10]
In light of these facts, the Court finds it extremely unlikely that the timing of Premier's
termination letter was purely coincidental and that retaliatory animus was not at least
one motivating reason for defendants' actions.

### iv.   Scope of adverse action

Finally, the Court rejects the notion that because Premier's termination of its
contracts affects other workers, it cannot constitute an adverse employment action
against plaintiffs.  An adverse employment action directed against persons in addition to
the direct targets of an employer's retaliatory animus can still be wrongful where the
employer may have taken broader action to send a chilling message or to hide its

---

[9] Insofar as Schneider contends that it lacks the contractual authority to require a
new subcontractor to use the workforce already operating at its warehouses, the Court
finds this argument unavailing.  This is so because Schneider has overwhelmingly superior
bargaining power when negotiating with subcontractors as evidenced by its contracts with
Impact and Premier, and acknowledged by Scott Larson in his deposition.

[10] The Court notes also that despite Premier's intention to operate in several other
warehouses in the Inland Empire, no plaintiffs have been offered jobs in any of those
facilities, providing further evidence that Premier's stated reasons for the termination are
likely pretextual.

retaliatory intent.  <u>See, e.g.</u>, <u>NLRB v. McClain of Georgia, Inc.</u>, 138 F.3d 1418, 1423–24 (11th Cir. 1998) (mass termination that encompasses targeted as well as non-targeted employees may be retaliatory if the employer ordered mass or general layoffs for the purpose of discouraging union activity or in retaliation against employees for the union activity of some); <u>Great Lakes Chemical Corp. v. NLRB</u>, 967 F.2d 624, 628 (rejecting employer's argument that discrimination must be proven on an individual basis).[11]  In this case, even though Premier cancelled its contracts in Illinois and Georgia, its termination of the Mira Loma contract appears likely to have still been done with retaliatory intent.  Indeed, as discussed above, plaintiffs have set forth substantial evidence of precisely such a scenario.

## b.    Risk of irreparable harm

The Court believes that plaintiffs will suffer serious irreparable harm absent the issuance of a preliminary injunction enjoining the February 24 termination.  In reaching this conclusion, the Court rejects defendants' argument that plaintiffs cannot establish irreparable harm because monetary damages alone would be sufficient to remedy any harm.  Schneider Opp'n at 14–15; Premier Opp'n at 13–14.  Defendants made this same

---

[11]  Schneider's reliance on <u>Werger</u>, 500 F.3d 710; <u>Somoza</u>, 513 F.3d 1206; and <u>Jordan</u>, 224 Fed. Appx. 499 is misplaced.  In <u>Werger</u>, the issue was whether an employer's new workplace rules restricting employee interactions could constitute an adverse employment action.  500 F.3d at 716.  Similarly, at issue in <u>Somoza</u> was whether the employer's challenged actions were sufficiently adverse, and not whether they were particularly targeted.  513 F.3d at 1219.  By contrast, in this case, there can be no doubt that termination constitutes an adverse employment action.  In <u>Jordan</u>, the Seventh Circuit held that there were two ways to establish a prima facie case for retaliation under Title VII. The court explained that a plaintiff "must *either*: (1) show that after filing a charge (or otherwise opposing an employer's allegedly discriminatory practice), only she, and not any similarly situated employee who did not take protected action, was subjected to a materially adverse action even though she was performing her job satisfactorily; *or* (2) present evidence that she engaged in protected activity and as a result suffered the materially adverse action of which she complains."  <u>Jordan</u>, 224 Fed. Appx. at 501 (emphasis added).

argument in opposition to plaintiffs' previous application for temporary restraining order requiring defendants to keep legally mandated payroll records. In rejecting the argument at that time, the Court explained that irreparable harm would result from the delays that plaintiffs, as low-wage workers, would face in having to prove the amount of their unpaid wages should defendants' recordkeeping prove inadequate, incomplete or fraudulent. Dkt. No. 43 at 7. Likewise, at this stage, because, delays in compensation threaten to impair plaintiffs' ability to meet basic needs, such harms are irreparable. See Smith v. Sup. Ct., 39 Cal.4th 77, 82 (Cal 2006) ("Wages, are not ordinary debts . . . because of the economic position of the average worker . . . it is essential to the public welfare that he receive his pay when it is due.")

In addition, the impending termination threatens considerable non-economic injuries. To this end, courts routinely recognize that retaliatory discharges deter workers from vindicating their statutory rights and seeking access to courts, and that these injuries constitute irreparable harm. See, e.g., Mullins v. City of New York, 626 F.3d 47, 55 (2d Cir. 2010) ("Unchecked retaliation subverts the purpose of the FLSA" and "the resulting weakened enforcement of federal law can itself be irreparable harm in the context of a preliminary injunction application."); Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 938–39 (9th Cir. 1987) ("[A]llegations of retaliation for the exercise of statutorily protected rights represent possible irreparable harm far beyond economic loss."). Indeed, in this case, plaintiffs have presented evidence that the allegedly retaliatory conduct at issue here has already intimidated workers, making them unwilling to raise workplace issues with their supervisors. See, e.g., Ramirez Decl. ¶ 7. In addition, is reasonable to infer that if the termination were allowed to proceed, any replacement workers hired by Schneider or a new contractor would be reluctant to assert their rights.[12] When combined with the irreparable economic injuries

_____

[12] The cases defendants cite in support of their argument do not compel a contrary (continued...)

plaintiffs face, these threatened harms leave no doubt that the "irreparable harm" element is met.

### c.   The balance of equities and the public interest

The Court finds that the balance of equities tips decidedly in plaintiffs favor.  In this respect, the Court believes that, in contrast to plaintiffs who will suffer serious injury absent an injunction, Schneider will not suffer substantial hardship if the Court enjoins the termination.  As discussed above, because Schneider intends to maintain operations at the Mira Loma warehouses, it is difficult to imagine what hardship, if any, it would suffer by retaining plaintiffs either as direct employees or jointly with another subcontractor.  Schneider's contention that it cannot "easily collapse" its current operations to bring workers directly onto its payroll is belied by the fact that it has already started to use its own employees to perform loading work in other locations. Larson Depo. at 132:22–133:14.  Even if this were not the case, Schneider has not explained why it would be burdensome to require a replacement contractor to retain the Schneider-Premier workforce.  Premier's argument that an injunction would burden it by requiring it to continue operations at the Mira Loma facility is similarly unavailing. As discussed above, the Court does not require Premier to revoke the termination of its contract with Schneider.  That is but one of the several options at defendants' disposal. Finally, the Court finds that given the strong federal and state policies barring retaliation against workers asserting their rights, the public interest strongly favors the issuance of an injunction.  See Gould v. Maryland Sound Industries, Inc., 31 Cal.App.4th 1137, 1148 (Cal. Ct. App. 1995) ("California courts have long recognized

---

[12](...continued)
result because they are inapposite or distinguishable.  For example, in Williams v. SUNY, 635 F. Supp. 1243, 1248 (E.D.N.Y. 1986), the court expressly recognized that "inherent in a retaliatory discharge case is the 'distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony in her effort to protect her own rights . . . [and this] may be found to constitute irreparable injury.'"

that wage and hour laws concern not only the health and welfare of the workers themselves, but also the public health and general welfare.").

### d.     Whether plaintiffs should be required to post a bond

The Court finds it appropriate to waive plaintiffs' Rule 65(c) obligation to post a bond.  Courts have discretion to dispense with Rule 65(c)'s security requirement altogether or to impose a nominal security when "requiring security would effectively deny access to judicial review," especially when the likelihood of success on the merits favors little or no bond.  <u>California ex rel. Van de Kamp v. Tahoe Regional Planning Agency</u>, 766 F.2d 1319, 1325–26, <u>as modified by</u> 775 F.2d 998 (9th Cir. 1985); <u>see also</u> <u>Miller v. Carlson</u>, 768 F. Supp. 1331, 1340–41 (N.D. Cal. 1991) (bond waived as plaintiffs are "indigent persons" and the preliminary injunction "is consistent with public policy"); <u>Capulo v. Bay Area Rapid Transit</u>, 5 F. Supp. 2d 1078, 1086 (N.D. Cal. 1998) (minimal $100 bond imposed for preliminary injunction in part because bond would cause hardship to plaintiffs).  Both factors are present in this case.  First, as this Court has already found, the individual plaintiffs are low-wage workers who cannot afford to post even nominal security.  Dkt. No. 43 at 11.  Next, for the reasons articulated above, the Court finds that plaintiffs are likely to prevail on the merits of their claim for retaliatory termination, and that granting injunctive relief is in the public interest.  Accordingly, the Court hereby exercises its discretion to waive the posting of a bond.

### B.     Plaintiffs' request for provisional class certification

The Court finds it appropriate to grant plaintiffs' request for provisional class certification for the purposes of this preliminary injunction.

To certify a class action, plaintiffs must set forth facts that provide prima facie support for the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  <u>Dunleavy v. Nadler (In re Mego Fir. Corp. Sec. Litig.)</u>, 213 F.3d 454, 462 (9th Cir. 2000) (internal quotations omitted).  These requirements effectively "limit the class claims to those fairly encompassed by

the named plaintiff's claims." <u>Falcon</u>, 457 U.S. at 155 (quoting <u>Califano v. Yamasaki</u>, 442, U.S. 682, 701 (1979)).  In addition to meeting these requirements, plaintiff must also show that the lawsuit qualifies for class action status under one of the three alternatives set forth in Rule 23(b).  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. ---, ---, 131 S.Ct. 2541, 2548 (2011).  Here, plaintiffs seek provisional certification pursuant to Section (b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  Pursuant to Rule 23 and the Court's general equitable powers, the Court has authority to provisionally certify a class for purposes of entering preliminary injunctive relief.  <u>See, e.g.</u>, <u>Thomas v. Johnston</u>, 557 F. Supp. 879, 916 n. 29 (W.D. Tex. 1983).

Schneider argues that the Court should deny provisional class certification because the case is still in its "infancy."  Opp'n at 17.  However, Schneider does not dispute that plaintiffs have met the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation.  Further, Schneider has not cited any authority for the proposition that provisional class certification is inappropriate simply because a case is in its early stages.  To the contrary, courts routinely grant provisional class certification for purposes of entering injunctive relief. <u>See, e.g</u>, <u>Baharona-Gomez v. Reno</u>, 167 F.3d 1228, 1233 (9th Cir. 1999); <u>Thomas</u>, 557 F. Supp. At 916 n. 29; <u>Kaiser v. County of Sacramento</u>, 780 F. Supp. 1309, 1312 n.5 (E.D. Cal. 1991).  Schneider also argues that provisional class certification should be denied because discovery has not begun.  Opp'n at 17.  However, discovery has now been open for nearly a month, during which time Schneider has not propounded discovery to plaintiffs nor identified any specific item of discover it needs to effectively oppose plaintiffs' request for provisional class certification.

Premier contends that plaintiffs cannot show commonality or typicality because plaintiffs are unable to show that every single putative class member engaged in

protected activity.  Opp'n at 16–18.  However, plaintiffs need not make such a showing to prevail on their claim for retaliation.  Instead, plaintiffs may prevail by showing that Premier terminated the entire Mira Loma workforce for the purposes of retaliating against those workers who did engage in protected conduct.

There is no dispute that the entire Schneider-Premier workforce will be terminated on February 24, 2012.  The Court's preliminary injunction order would require defendants to revoke this termination.  Accordingly, the Court hereby grants plaintiffs' request for provisional class certification for the purposes of this preliminary injunction only, of a class comprising all individuals employed by the Schneider and Premier defendants at the Mira Loma warehouses at any time from the announced termination through the present.

### C.   Plaintiffs' motion for approval of <u>Hoffman-La Roche</u> notice

#### 1.   Background

Plaintiffs seek the conditional certification of the FLSA collective action claims in this lawsuit and authorization to disseminate notice to all similarly situated current and former workers employed by defendants in the Mira Loma warehouse facility. Plaintiffs have submitted two forms of proposed notice, a "long-form" notice (attached as Exhibit A to their motion) and a "short-form" notice (attached to the motion as Exhibit B).

#### 2.   Legal Standard

Employees alleging violations of their rights under the FLSA are entitled to bring a collective action lawsuit seeking relief on their own behalf and on behalf of all "other similarly situated employees."  29 U.S.C. § 216(b).  Such "collective" actions benefit the judicial system by enabling the "efficient resolution of one proceeding of common issues of law and fact," and by providing similarly situated employees the opportunity to "lower costs to vindicate rights by the pooling of resources."  <u>Hoffman-La Roche</u>, 493 U.S. at 170.  Unlike absent class members in a Rule 23 class action, absent members in a FLSA collective action must affirmatively consent, or "opt in," to be

entitled to relief.  29 U.S.C. § 216(b); Thiesen v. Gen Elec. Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001).  Because the benefits of FLSA collective actions "depend on employees receiving accurate and timely notice concerning the pendency of collective action," district courts have broad authority to facilitate early notice to potential collective action members and to establish a procedure and a deadline for those potential plaintiffs to opt into the lawsuit.  Hoffman-La Roche, 493 U.S. at 169–72.

Collective action designation under the FLSA is a two-step process: conditional notice-stage designation, and later, a determination post-discovery as to whether the case should proceed to trial on a collective basis.  See, e.g., Adams v. Inter-Con Sec. Sys., 242 F.R.D. 530, 536 (N.D. Cal. 2007); Wynn v. National Broadcasting Co., Inc., 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002); Thiessen, 267 F.3d at 1102–03.  The standard for certification at the notice stage "is a lenient one that typically results in certification."  Gerlach v. Wells Fargo & Co., Case No. C 05-0585 CW, 2006 WL 824653, at *2 (N.D. Cal. Mar. 28, 2006) (granting conditional certification) (citing Wynn, 234 F.Supp.2d at 1082); Romero v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 482 (E.D. Cal. 2006) ("The decision is made under a 'fairly lenient standard' and the usual result is conditional class certification.").

Courts have held that conditional certification is appropriate based on "substantial allegations that the putative class members were together victims of a single decision, policy, or plan."  Thiessen, 267 F.3d at 1102 (internal quotations and citations omitted); Bonilla v. Las Vegas Cigar Co., 61 F. Supp. 2d 1129, 1139 n. 6 (D. Nev. 1999) (requiring "some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice]").

If a court finds that the notice-stage standard is met, the court conditionally authorizes the case as a collective action and orders notice disseminated to potential class members, allowing them to opt in by filing a written consent.  See, e.g., Wynn, 234 F. Supp. 2d at 1082; Garner v. G.D. Searle Pharmaceuticals & Co., 802 F. Supp.

418, 423 n. 4 (M.D. Ala. 1991) ("A primary purpose of notification is to locate other similarly situated employees who may wish to bring their claims to the court's attention *before* this litigation is resolved.").

### 3.    Analysis

### a.    Whether Notice is Warranted

Plaintiffs argue that the Court should approve notice to a provisional class because the plaintiffs' allegations, declarations, and other evidence show that they and other collective action members are "similarly situated" because they have been subject to substantially similar policies and practices.  Mot. at 10.  According to plaintiffs, courts have approved conditional certification of FLSA claims where plaintiffs allege that their employers violated the FLSA by suffering or permitting plaintiffs to work "off the clock," so long as the evidence demonstrates "'a likelihood that there are similarly situated employees who would benefit from an awareness of the pending suit'" id. (quoting Belcher v. Shoney's, Inc., 927 F. Supp. 249, 253 (M.D. Tenn. 1996)), or "'support[s plaintiffs'] position that there are other [workers] who feel they have been aggrieved in ways similar to those of which [plaintiffs] complain[].'" Id. at 11 (quoting White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1316–17 (M.D. Ala. 2002)).  In addition, plaintiffs maintain that the declarations submitted by the named plaintiffs and several of their co-workers establish that there are many workers employed by defendants in the Mira Loma warehouses during the applicable period who performed work in the same manner as they did, who were compensated under the same pay schemes, and who suffered the same alleged violations of federal and state wage-and-hour law.  Id. (citing Carrillo Decl. ¶ 4; Arceo Decl. ¶ 4; Esquivel Decl. ¶¶ 5, 8; Lopez Decl. ¶ 4; Morales Decl. ¶ 5.)

In opposition, Impact argues that because the record includes only "two individual' declarations against Impact," plaintiffs have not met adequately met there burden of showing there are others who are similarly situated.  Impact Opp. at 3–4. Schneider again argues that it is not plaintiffs' employer, and therefore that it should not

be included in any notice.  Schneider Opp. at 4–6.  Further, Schneider argues that the Court should deny conditional certification because not enough potential opt ins have shown interest in this lawsuit.  Id. at 10–12.  Finally, Schneider argues that it cannot implement notice because it has no control over the warehouse workers and no ability to communicate with them.  Id. at 12.[13]

The Court finds that plaintiffs have met their burden of showing that there are potentially similarly-situated class members who would benefit from receiving notice at this stage of the pendency of this action as to all defendants.  With respect to Impact, the declarations of the two plaintiffs Impact identifies, Evaristo Morales and Juan Chavez, without more would be sufficient to satisfy plaintiffs' "lenient" burden.  Indeed, many courts have held that on a motion for FLSA conditional certification, plaintiffs' burden and can be satisfied with a small number of declarations.  Romero, 235 F.R.D. at 482–83 (two declarations); Brown v. Money Tree Mortgage, Inc., 222 F.R.D. 676, 688–81 (D. Kan. 2004) (same); Ballaris v. Wacker Silttronic Corp., No. 00-1627-KI, 2001 WL 1335809, *3 (D. Or. Aug. 24, 2001) (same).  In any event, plaintiffs Morales and Chavez are not the only two warehouse workers asserting claims against Impact as nearly 20 workers have opted into this lawsuit.  With respect to Schneider, the Court notes that for the purposes of this motion, plaintiffs need only show that the putative opt-in plaintiffs are similarly situated with respect to the disputed claims.[14] Accordingly, for present purposes, putative class members exist who have the same claims as the existing plaintiffs that rely in part on the "joint employer" theory of

_____

[13] Premier concedes that plaintiffs have met their burden for the Court to approve Hoffman La-Roche notice, but objects to the scope of the notice of the notice as proposed by plaintiffs, as well as its content.

[14] The merits of Schneider's "joint employer" defense will ultimately be resolved at a later stage of the proceedings.  However, for the reasons articulated above, the Court believes that plaintiffs have shown a likelihood of success on their assertion that Schneider is a "joint employer."

liability.  Schneider's contention that it has no control over the warehouse workers and
no ability to communicate with them is belied by Impact's contention that Schneider is
the *only* defendant with the ability to post notices in the warehouses where they can be
seen and read because Schneider does not allow Impact or Premier access to the notice-
posting area.  Impact Opp'n at 10.  Finally, Schneider's argument that too few potential
opt ins have shown interest in this lawsuit ignores that numerous workers have already
opted in, demonstrating considerable interest among potential claimants.  Nevertheless,
the requirement of a special showing of interest "has almost never been applied outside
of the Eleventh Circuit, and has never been applied in the Ninth Circuit."  Gomez v. H
& R Funlund Ranches, Inc., 2010 WL 5232973, *5 (E.D. Cal. Dec. 16, 2010) (citing
cases); Delgado v. Ortho-McNeil, Inc., 2007 WL 2847238, *2 (C.D. Cal. Aug. 7, 2007)
(same).[15]

Having determined that Hoffman-La Roche notice is warranted, the Court now
addresses the appropriate scope and content of such notice.

### b.    Appropriate Scope of Notice

Plaintiffs request that their short and long-form notices be disseminated to all
similarly situated current and former workers, beginning within 10 days after the Court
orders such notice to be provided and continuing until 180 days after such order as
follows:

(1) The long-form Notice (which includes a Consent to Sue form, and which will
be translated into Spanish) shall be included in the next pay envelopes that defendants
provide to each current employed collective action member;

(2) The long-form Notice shall be posted in at least five locations in each of the
Mira Loma warehouses, including at the entry and in the lunchroom of each warehouse,

---

[15] Schneider's reliance on Smith v. T-Mobile USA Inc., 570 F.3d 1119, 1122–23
(9th Cir. 2009) is misplaced because that case did not involve the standard for collective
action certification, and merely held that, where plaintiffs in an FLSA case settle their
individual claims before other workers have opted in, the case becomes moot.

that are accessible to the workers and including where other notices of workplace rights are posted;

(3) The long-form Notice shall also be mailed to each formerly employed collective action member, at the worker's last-known address according to defendants' best available contact information for such worker, such mailing to be accomplished at defendants' expense within 10 days after defendants provide such contact information to plaintiffs' counsel, which contact information defendants shall provide to plaintiffs no later than 21 days after the date of the Court's order;

(4) The short-form notice shall be distributed by plaintiffs' counsel at such public locations in the community in and surrounding the Mira Loma warehouses and in Mexico (which may include places of worship, community centers, health and wellness centers, transit stops, advocacy group offices, the Mexican consulate, and other locations) as plaintiffs' counsel determine to be likely venues for effectively providing notice to prospective collective action members; and

(5) The short-form notice, or a summary of the information set forth therein, including directions for obtaining more complete information, shall also be disseminated by local media (which may include radio and television stations and local newspapers) in Spanish and English, at times and in a manner that plaintiffs' counsel determine will be effective in providing notice to prospective collective action members.

Defendants object to plaintiffs' proposed method of giving notice, arguing that paycheck enclosures are "unreasonably intrusive," Schneider Opp'n at 14, that such enclosures and posted notices send the message to workers that defendants "sanction" plaintiffs' claims, Premier Opp'n at 6–8, or would result in improper workplace coercion. Impact Opp'n at 10. Defendants also argue that using local media and posting notices with community organizations in Mira Loma and Mexico is overly broad. Schneider Opp'n at 12; Premier Opp'n at 9; Impact Opp'n at 11–12. Further, defendants maintain that because there has been no finding of liability by the Court,

1  plaintiffs should bear the full burden of paying for any notice.  Schneider Opp'n at 13;

2  Premier Opp'n at 11; Impact Opp'n at 12.

3   The Court finds plaintiffs' proposed plan for distributing notice to potential opt-in

4  plaintiffs reasonable and appropriate to ensure that similarly situated workers receive

5  notice of the pendency of this action.  In reaching this conclusion, the Court notes that

6  courts commonly approve the type of alternative forms of notice plaintiffs seek here,

7  especially in cases involving low-wage, transient workers.  See, e.g., Six (6) Mexican

8  Workers v. Arizona Citrus Growers. 904 F.2d 1301, 1304 n.2 (9th Cir. 1990) (class

9  notice accomplished by "mailing notice to those persons for which accurate addresses

10  existed, publication and radio announcements in relevant U.S. and Mexican

11  newspapers, and posting"); Montoya v. S.C.C.P. Painting Contractors, Inc., 2008 WL

12  554114, *1 (D. Md. 2008) (approving notice posting "at 35 locations around the

13  Washington metropolitan area, printing notices in three local Latino newspapers, radio

14  advertisements on five local stations, and a posted notice on the Washington Lawyer's

15  Committee for Civil Rights and Urban Affairs website").  Furthermore, in light of the

16  potential for efficiently and effectively reaching similarly situated workers, the Court is

17  unpersuaded by defendants' objections to the enclosure of notice in workers' pay

18  envelopes or its posting at defendants' facilities.  See Oppenheimer Fund, Inc. v.

19  Sanders, 437 U.S. 340, 356 n.22 (1978) (noting that the practice of requiring defendants

20  "to enclose class notices in their own periodic mailings to class members . . . reduce[s]

21  the expense of sending the notice"); see also Pereira v. Foot Locker, Inc., 261 F.R.D. 60,

22  68 (E.D. Pa. 2009) (specifically rejecting the argument that workplace posting "would

23  create an undue interruption in the workplace," or be "unduly disruptive," instead

24  finding that posting notices is "an effective an efficient way to ensure that potential

25  class members are aware of the litigation").

26   The Court also finds it reasonable to require defendants to pay the costs of notice

27  provided through direct mailing.  This is so because the FLSA is a fee-shifting statute as

28  to which plaintiffs' have shown a likelihood of success on the merits.  See 29 U.S.C.

§216(b).  In a fee-shifting case, where plaintiffs have demonstrated a likelihood of success on the merits that would ultimately entitle them to recover all reasonable fees and expenses, courts have discretion to require defendants to pay for the costs of reasonable notice.  See Hunt v. Imperial Merchant Srvcs., 560 F.3d 1137, 1140 (9th Cir. 2009) (affirming order requiring notice cost-shifting even though liability ruling was pending on appeal); Fournigault v. Independence One, 242 F.R.D. 486, 490 (N.D. Ill. 2007) (shifting costs based on court's "impression" that plaintiffs would prevail on liability).  In this case, plaintiffs' successful motion for preliminary injunction indicates that they are likely to prevail on the merits of their claims.  Accordingly, shifting some of the expenses associated with notice is appropriate.

### c.    Appropriate Content of Notice

The parties appear to have three principal points of disagreement regarding the proper content for the notice.  Rather than advise the parties of specific changes that must be made, the Court offers general guidance as to these three points.  In light of this guidance, the Court directs counsel to meet and confer and submit revised notice with any remaining disputes highlighted.

### i.    Warning regarding defendants' litigation costs

Impact and Premier each request that the notice include a warning that if workers choose to opt in, yet lose at trial, they may be required to pay a portion of defendant's litigation costs.  Lavanant Decl. ¶5(k); Impact Opp'n at 15.  The Court does not believe it appropriate to include such a warning.  This is so for two reasons.  First, the Court believes that this kind of warning would undermine the FLSA's goal of encouraging full enforcement of statutory rights, especially where potential opt-in plaintiffs are low-wage workers.  Next, plaintiffs have already prevailed on their first motion for preliminary injunction, and the Court and DLSE have determined that defendants' recordkeeping practices are unlawful.  Accordingly, the potential chilling effect of defendants' proposed warning outweighs the realistic likelihood that any future opt-ins would be required to pay a portion of defendants' litigation costs.

**ii.    Applicability of equitable tolling**

Plaintiffs offer two separate theories in support of a notice that preserves their claim for equitable tolling, thereby allowing workers with potentially tolled claims to opt into this litigation to pursue those claims.  First, plaintiffs' contend that their FLSA claims may be tolled as of November 27, 2011, when plaintiffs began the meet and confer process regarding notice.  Second, plaintiffs assert that their claims may be tolled back to the time that each defendant first started operating in the warehouse.  Reply in Support of Mot. for Approval of <u>Hoffman La-Roche</u> Notice at 12.  Each of the defendants objects to such tolling, arguing that equitable tolling is only appropriate where litigants have "actively pursued their judicial remedies or have been tricked by their adversary's misconduct into allowing the limitations period to pass," Premier Opp'n at 12, and that the Supreme Court has cautioned federal courts to "sparingly" invoke the doctrine of equitable tolling.  Impact Opp'n at 7; Schneider Opp'n at 20–21.  Although the Court recognizes that equitable tolling is an extraordinary remedy, <u>Irwin v. Dep't of Veteran's Affairs</u>, 498 U.S. 89, 96 (1990), the Court nevertheless believes tolling back to the time that each defendant first started operating in the warehouse appropriate in the case.  This is so because plaintiffs have set forth substantial evidence that defendants' misconduct has prevented workers from obtaining the information necessary to determine whether their rights under the FLSA were violated.  <u>See</u> <u>Adams</u>, 242 F.R.D. at 543 (equitable tolling warranted where "defendants' misconduct induces failure to meet the deadline").[16]

_____

[16] In this regard, the Court has already ruled that plaintiffs are likely to prevail on their claims that defendants failed to provide legally-mandated disclosures regarding workers' hours or rate of pay, and failed to provide access to workers' wage information.  <u>See</u> Dkt. No. 43 at 3–6.  Additionally, plaintiffs have presented evidence that employees who asked about the basis for their pay, or who objected to defendants' practices, were subject to termination.  <u>See</u> Esquivel Decl. ¶ 6; Morales Decl. ¶¶ 5; Diaz Decl. ¶¶ 5-7.  In this environment, it would be reasonable to expect workers not to assert FLSA claims for
(continued...)

### iii.    Length of opt-in period

Finally, defendants object to a 180-day opt-in period, arguing that 30-45 days would be sufficient for a potential class member to understand the notice, seek help if they do not understand it, and decide whether or not to return the authorization to join the lawsuit, Premier Opp'n at 12, that a 180-day notice period is "impractical" and would unreasonably delay the case; Impact Opp'n at 13, and that a 180-day period is "overly burdensome" and "excessive." Schneider Opp'n at 18.  The Court finds defendants' arguments unavailing because they ignore unique the obstacles in this case that could delay potential plaintiffs' filing of consent forms.  This case concerns low-wage, immigrant workers in an industry with high turnover.  Thus, it is reasonable to expect that potential opt-in plaintiffs who worked for defendants in the past are likely to have moved several times since then, and often away from the area.  See Lima v. Int'l Catastrophe Solutions, Inc., 493 F. Supp. 2d 793, 804 ("Longer opt-in periods have been granted in cases where potential plaintiffs are hard to contact due to their migration or dispersal."); Roebuck v. Hudson Valley Farms, 239 F. Supp. 2d 234, 241 (N.D.N.Y 2002) (allowing nine-month opt-in period for migrant farm workers)). Defendants' reliance on cases imposing shorter periods is misplaced because those cases did not involve the extenuating circumstances present here.  See, e.g., Lewis v. Wells Fargo & Co., 669 F. Supp. 2d 1124, 1126 (N.D. Cal. 2009) (75-day opt-in period for bank's information technology employees); Beetler v. Trans-Foam, Inc., 2011 U.S. Dist. LEXIS 141349, *14 (N.D. Ohio Dec. 8, 2011) (45-day period for "general laborers"); Adams, 242 F.R.D. at 542 (90-day period where plaintiffs "g[a]ve no reasoning" to justify requested 120-day period).  Accordingly, the Court believes that plaintiffs proposed 180-day opt-in period is appropriate.

///

----

[16](...continued)
lack of information and fear of retaliation.

III.   **CONCLUSION**

In accordance with the foregoing, the Court hereby GRANTS plaintiffs' motion for preliminary injunction.  The Court GRANTS plaintiffs' request for provisional class certification.  In addition, the Court GRANTS plaintiffs' motion for approval of Hoffman La-Roche notice and directs counsel to meet and confer and submit revised notice with any remaining disputes highlighted

IT IS SO ORDERED.


Dated: January 31, 2012

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE