THERESA M. TRABER (SBN 116305)
LAUREN TEUKOLSKY (SBN 211381)
Traber & Voorhees
128 N. Fair Oaks Avenue, Suite 204
Pasadena, California 91103
Telephone: (626) 585-9611
Facsimile: (626) 585-1400
tmt@tvlegal.com
lt@tvlegal.com

MICHAEL RUBIN (SBN 80618)
JONATHAN WEISSGLASS (SBN 185008)
JENNIFER SUNG (SBN 254741)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
mrubin@altber.com
jweissglass@altber.com
jsung@altber.com

SANDRA C. MUÑOZ (SBN 190404)
Law Offices of Sandra C. Muñoz
5429 E. Beverly Blvd.
Los Angeles, CA 90022
Telephone: (323) 720-9400
Facsimile: (323) 720-9090
scm4law@att.net

(Add'l counsel on next page)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

EVERARDO CARRILLO, *et al.*, for themselves and all others similarly situated and the general public,

Plaintiffs,

v.

SCHNEIDER LOGISTICS, INC., *et al.*,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 11-8557 CAS (DTBx)

**SUPPLEMENTAL DECLARATION OF LAUREN TEUKOLSKY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL RESPONSES TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS PROPOUNDED TO SCHNEIDER LOGISTICS TRANSLOADING & DISTRIBUTION, INC.**

Date:      June 21, 2012
Time:      10:00 a.m.
Judge:     Hon. David T. Bristow

Discovery cutoff:  None set
Pretrial conf.:   None set

1        ) Trial date:        None set

2   <u>Additional counsel for plaintiffs:</u>

3

4   GUS T. MAY (SBN 159436)
5   KEVIN R. KISH (SBN 233004)
    MATTHEW E. DECAROLIS (SBN 238595)
6   Bet Tzedek Legal Services
7   3435 Wilshire Blvd., Suite 470
    Los Angeles, CA  90010
8   Telephone: (323) 939-0506
9   Facsimile: (213) 384-3524
    gmay@bettzedek.org
10  kkish@bettzedek.org
11  mdecarolis@bettzedek.org

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF LAUREN TEUKOLSKY**

I, Lauren Teukolsky, hereby declare as follows:

1.      I am a partner in the law firm of Traber & Voorhees, an attorney duly licensed to practice law in the State of California and before this federal court, and one of the counsel of record for plaintiffs in the above-captioned lawsuit.   The facts stated here are based on my personal knowledge or my review of the file in this case.  If called as a witness, I could and would competently testify to the following matters.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the deposition of Daniel Soto, which took place on May 24, 2012.  The certified copy of the deposition transcript is not yet available, so I have attached excerpts from the rough transcript, which the Court Reporter prepared pursuant to the request of the parties.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a document produced by Impact on May 14, 2012 Bates stamped Impact 641-42.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Ramon Cepeda re: Plaintiffs' Consolidated Reply Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction Enjoining Retaliatory Mass Termination, dated January 9, 2012.  I caused this document to be filed on January 23, 2012.

5.      Attached hereto as Exhibit 4 is a true and correct copy of Defendants Schneider Logistics, Inc.'s and Schneider Logistics Transloading and Distribution, Inc.'s Sur-Reply in Opposition to Plaintiffs' Motion for Preliminary Injunction As a Result of New Evidence and Legal Arguments Set Forth By Plaintiffs, which defendants filed on January 26, 2012.

6.      Attached hereto as Exhibit 5 is a true and correct copy of an email that Impact produced on May 14, 2012 Bates stamped Impact 730-32.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an email that Impact produced on May 14, 2012 Bates stamped Impact 774.

8.      Attached hereto as Exhibit 7 is a true and correct copy of the Declaration of Vince Redgrave in Support of Defendant Schneider Logistics Transloading and Distribution Inc.'s Opposition to Plaintiffs' Application for a Restraining Order and Order to Show Cause re: Preliminary Injunction Requiring Defendants to Keep and Disclose Mandatory Payroll Records, which defendants filed on November 4, 2011.

9.      Attached hereto as Exhibit 8 is a true and correct copy of an excerpt from Appellant Schneider Logistics, Inc.'s and Schneider Logistics Transloading and Distribution, Inc.'s Opening Brief, which defendants filed in the Ninth Circuit on March 26, 2012.

10.      Plaintiffs propounded the first set of Requests for Production of Documents on February 1, 2012, which included the Wal-Mart discovery now at issue.  We propounded the RFPs five weeks before stipulating to the bifurcated discovery order on March 6, 2012, and we had no intention that the order would preclude our ability to propound discovery related to Wal-Mart, particularly given our agreement that the last date to substitute named defendants for Doe defendants would be September 3, 2012.

11.      I have personally reviewed all of the documents produced by Schneider. Of the approximately 5,750 documents that Schneider has produced, 4,139 are printouts of hard copy invoices from Impact and Premier to Schneider for services rendered; 521 are printouts of Premier employee time sheets; 347 are handwritten security logs of visitors to and from the warehouses; and 206 are duplicates of other documents produced.  That leaves 537 documents; and 246 of *those* were produced long ago, in connection with Judge Snyder's order requiring expedited discovery into Schneider's mass retaliatory termination of the Schneider-Premier class members.  In other words, Schneider has actually produced only 291 documents in response to plaintiffs' RFPs that are not invoices, security logs or time sheets.  These documents mostly comprise: the bids that Impact and Premier submitted to obtain the

labor contracts; documents related to DLSE's October 2011 inspection of the warehouses; and emails between Schneider's public relations personnel and reporters regarding this lawsuit.

12.     Schneider has produced only *two* emails reflecting communications between Schneider and Impact or Premier supervisors.  By contrast, Impact and Premier have now produced hundreds of such emails.  To date, Schneider has provided no explanation – during the meet and confer process or in sworn declarations in opposition to plaintiffs' motion – for its failure to produce these emails.

13.     Although Schneider suggested during the meet and confer and again on the June 6, 2012 conference call with the Court that the emails were purged pursuant to a document destruction policy, Schneider has not yet provided this policy to plaintiffs or the Court, and has not actually confirmed that the documents were destroyed under such a policy.

14.     Furthermore, Impact has produced dozens of emails between it and Schneider that post-date the filing of this lawsuit on October 17, 2011, all of which I have reviewed personally.  These emails include numerous complaints from Schneider that Impact is not meeting Schneider's productivity standards, and an email from Impact's Director of Operations (Danny Soto) informing Schneider's General Manager (Vince Redgrave) that Schneider had been instructing Impact to falsify time records (attached hereto as Exhibit 2).


I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Executed on June 7, 2012 in Pasadena, California.


_____
/s/

Lauren Teukolsky

# Exhibit 1

Soto Daniel - ROUGH

```
 1   Deposition of Daniel Soto
 2   BY MR. KISH:
 3        Q    Will you please state and spell your name?
 4        A    Daniel Soto, D-a-n-i-e-l, last name Soto,
 5   S-o-t-o.
 6        Q    Good morning, Mr. Soto.
 7        A    Good morning.
 8        Q    Have you ever had your deposition taken before?
 9        A    No.
10        Q    So, I'm just going to go over a couple of the
11   ground rules I'm sure you spoke to Tracy about it.  You
12   have been sworn in by the court reporter.  That means that
13   the testimony you give is under oath so even though we're
14   sitting here around a table informally, your testimony has
15   the same force and it would if you were giving it in court
16   do you understand that?
17        A    Yes.
18        Q    The court reporter will be recording everything
19   that we say and that means that we need to be careful to
20   allow her to do that without talking over one another so
21   if you could wait for me to finish my questions and I'll
22   try to wait for you to finish your answers that would be
23   great.  At the end of the deposition when it's done,
24   she'll prepare a booklet, a transcript and you'll have an
25   opportunity to review that and you can make any changes
```

1

```
 1   that you think are needed, but if you do make changes then
```

Soto Daniel - ROUGH

16    A    Maybe somewhere between ten and 25.

17    Q    And other than filling out the sheets that had

18  the hours that people worked and which loads they worked

19  on, were there any other procedures that you were

20  investigating?

21    A    Safety.

22    Q    Which safety procedures were you investigating?

23    A    Just making sure that the employees had their

24  areas cleaned around the doors to make sure that they

25  couldn't get injured.

15

1    Q    Anything else?

2    A    No.

3    Q    Did you come to any conclusions about whether

4  Impact employees were following procedures as a result of

5  your investigation?

6        MR. AHEARN:  Objection, vague.

7        THE WITNESS:  At the moment when I was there?

8  They were because they were filling out all the paperwork.

9  BY MR. KISH:

10    Q    At the moment you were in the warehouses?

11    A    When I showed up at the warehouse they were

12  following procedures.

13    Q    And did you come to a conclusion about whether

14  they were following procedures before you showed up at the

15  warehouse?

16        MR. AHEARN:  Objection, vague.

17        THE WITNESS:  Just hearsay basically.  I mean I

18  wasn't there so I don't know if they were following

19  procedures before.  Just from the comments from what

Page 14

Soto Daniel - ROUGH

20    employees said.

21    BY MR. KISH:

22        Q    What did the employees say?

23        A    That Ramon was falsifying information on the

24    paperwork.

25        Q    How many associates told you that Ramon Cepeda

16

1    was falsifying information on their paperwork?

2             MR. AHEARN:  Objection, vague, lacks foundation.

3             THE WITNESS:  Don't know the exact number.

4    BY MR. KISH:

5        Q    More than one?

6        A    More than one.

7        Q    Was it all of the associates who told you that?

8        A    Not everyone.

9        Q    When you said that you -- I'm sorry did you say

10    you interviewed between --

11        A    10 and 25.

12        Q    Ten and 25 associates.  Of that number how many

13    would you say told you that Ramon Cepeda was falsifying

14    information on their records?

15             MR. AHEARN:  Objection, vague, lacks foundation.

16             MS. COSTANTINO:  Asked and answered.

17             MR. AHEARN:  Join.

18             MS. COSTANTINO:  Go ahead.

19             THE WITNESS:  Don't know the exact personal or

20    even the exact number but I know that they were very

21    hesitant to tell me any information.  I was brand new so

22    nobody really -- but maybe --

Page 15

```
                       Soto Daniel - ROUGH
23          MS. COSTANTINO:  Don't guess.  If you have a good
24   estimate.
25               THE WITNESS:  Yeah, I don't have a good estimate.
```
                                                              17


```
 1   BY MR. KISH:
 2       Q    So I'll explain something.  Nobody here wants you
 3   to guess at anything but I am entitled to an estimate if
 4   you can provide an estimate.  So, I'm going to ask you
 5   things like was it more than five associates who told you
 6   that Ramon Cepeda falsified their information?
 7       A    Yes.
 8       Q    Was it more than ten associates?
 9       A    No.
10       Q    Between five and ten associates told you that
11   Ramon Cepeda was falsifying information?
12       A    Yes.
13          MR. AHEARN:  Objection, vague, lacks foundation.
14   BY MR. KISH:
15       Q    When you said is that associates were hesitant to
16   talk to you because you were new how did you understand
17   that?
18       A    What do you mean.
19       Q    Why did you have that impression?
20       A    Because that's how any employee of somebody who's
21   brand new, you don't have trust.  You don't just start
22   telling a whole bunch of information if you don't trust
23   them.
24       Q    You said earlier that you also interviewed Ramon
25   Cepeda?
```
                                                              18

Soto Daniel - ROUGH

1        A     Yes.

2        Q     Did he confirm that he was falsifying information

3   on employees' time records?

4              MR. AHEARN:  Objection, vague, lacks foundation.

5              MS. COSTANTINO:  Join also as to scope and time.

6   If you can answer the question.

7              THE WITNESS:  At the moment, no.

8   BY MR. KISH:

9        Q     What do you mean when you say at the moment?

10       A     When I showed up in the building, no, he denied

11  ever falsifying anything.

12       Q     At any time did he ever tell you that he had

13  falsified records in the past?

14       A     Yes.

15             MR. AHEARN:  Objection, vague, lacks foundation.

16  BY MR. KISH:

17       Q     When did he tell you that?

18             MR. AHEARN:  Same objections.

19             THE WITNESS:  I believe sometime in November.

20  BY MR. KISH:

21       Q     When he told you that he had falsified employees'

22  time records in the past was this during a subsequent

23  conversation?

24             MR. AHEARN:  Vague, lacks foundation, objection.

25             THE WITNESS:  Subsequent I don't -- what do you

                                                              19


1   mean by that?

Soto Daniel - ROUGH

2   BY MR. KISH:

3       Q    So was this a conversation that you had after

4   your initial investigation?

5       A    Yes.

6       Q    And when you were talking about procedures

7   earlier, you said you were referring to records where

8   Impact employees' time hours that they worked were

9   written?

10      A    Yes.

11      Q    And the loads that they worked on were written?

12      A    Yes.

13      Q    So, when associates told you that Ramon Cepeda

14  had falsified records are these the records that you're

15  referring to?

16      A    Yes.

17           MR. AHEARN:   Objection, vague, lacks foundation.

18  BY MR. KISH:

19      Q    And did they tell you what on those records Ramon

20  Cepeda falsified?

21           MR. AHEARN:   Vague, lacks foundation.

22           THE WITNESS:   Time?  Their time in and time outs

23  and the pay.

24  BY MR. KISH:

25      Q    And what did they tell you Ramon Cepeda had

                                                        20


1   written on those records?

2       A    Incorrect times.

3       Q    So for example, if someone showed up at a certain

4   time in the morning, Ramon Cepeda would write a different

5   time?

                        Page 18

Soto Daniel - ROUGH

6     A    Yes.

7     Q    Is that an example?  Did the associates tell you

8  whether he wrote down fewer hours than they had actually

9  worked?

10    A    Yes.

11    Q    When you interviewed the lead employees -- first

12  of all can you describe what the lead employees do that's

13  different than a none lead employee?

14    A    A lead employee during that period he was

15  responsible for the paperwork, responsible to make sure

16  that the day-to-day operations were completed and also at

17  the same time he also worked so he was working it.  So he

18  was responsible to do his un loads plus all the other

19  stuff.

20    Q    So, did anyone ever tell you that lead employees

21  had falsified the records, the time records?

22    A    Some employees, yes.

23    Q    How many employees told you that?

24    A    At the moment, less than ten.

25    Q    At a later date, did more employees tell you that

21

1  leads had falsified time records?

2     A    Eventually, yes.

3     Q    And how did that come about?  How did it come

4  about that more employees told you later?

5     A    I build my trust with the employees.

6     Q    So was your investigation ongoing after that

7  first time when you went to the warehouse to interview

8  people?

Page 19

Soto Daniel - ROUGH

9 A Yes.

10 Q How many times dug to the warehouse to interview

11 employees?

12 A Every day.

13 Q For how long?

14 A Probably about a good month.

15 Q And by the end of that month, how many employees

16 would you estimate told you that Ramon Cepeda had

17 falsified time records?

18 A Towards the end of that month, maybe about 40

19 some employees, 40.

20 Q By the end of that month, how many employees told

21 you that lead employees had falsified time records?

22 A Same amount.

23 Q Did you learn during the course of your

24 investigation when the -- when Ramon Cepeda began

25 falsifying time records?

22

1 A No.

2 Q Did you ask anyone when the falsification began?

3 A Yes.

4 Q And what was the answer that you received?

5 A No definite answer.  There was no specific time

6 or date.

7 Q Did you come to a conclusion about how long the

8 falsification had been going on?

9 MR. AHEARN:  Objection, vague, lacks foundation.

10 THE WITNESS:  No.

11 BY MR. KISH:

12 Q Did anyone tell you, for example, that it had

Page 20

Soto Daniel - ROUGH

20          MR. AHEARN:  Vague.  Objection, vague.

21   BY MR. KISH:

22      Q    So, for example, did Ramon Cepeda write down a

23   particular number of hours on time records that was not

24   the correct number of hours?

25          MS. COSTANTINO:  Objection, vague, ambiguous,

25

1    incomplete hypothetical.

2           THE WITNESS:  They did not tell me.  Ramon --

3    they told me Ramon was not in the building, so --

4    BY MR. KISH:

5       Q    Did they tell you whether leads had written down

6    a particular number of hours, for example, on their time

7    records?

8       A    Yes.

9       Q    What did they tell you?

10      A    That they either reduced their times, their hours

11   or put in a later time of entry.

12      Q    Did anyone tell you that the leads had put --

13   written down an earlier time of exit?

14      A    Yes.

15      Q    Did anyone tell you whether there was an average

16   number of hours that leads were writing down on

17   timesheets?

18      A    No.

19      Q    So, after you -- well, during this time period

20   when you were conducting the investigation after the first

21   day when you went there you had a subsequent conversation

22   with Ramon Cepeda, correct?

Page 23

Soto Daniel - ROUGH

23    A    Yes.

24    Q    How many conversations did you have with him

25    after the first one?

26

1    A    Almost every day.

2    Q    And is it correct that ultimately he told you

3    that he had falsified time records for Impact employees?

4         MR. AHEARN:  Vague lacks foundation.

5         THE WITNESS:  Eventually he did.

6    BY MR. KISH:

7    Q    Do you recall how long after you started your

8    investigation he told you?

9    A    Probably, about a month.

10    Q    Did he tell you why he had falsified time records

11    for Impact employees?

12    A    Yes.

13         MR. AHEARN:  Vague, lacks foundation.

14    BY MR. KISH:

15    Q    What it was reason he gave to you for falsifying

16    Impact employee time records?

17         MR. AHEARN:  Vague, lacks foundation.

18         THE WITNESS:  That he was told to.

19    BY MR. KISH:

20    Q    And did he say who dollars told him to falsify

21    employee time records?

22         MR. AHEARN:  Vague, lacks foundation.

23         THE WITNESS:  Yes.

24    BY MR. KISH:

25    Q    Who did he say had told him to falsify time

27

Page 24

Soto Daniel - ROUGH

1    reports?

2            MR. AHEARN:  Vague, lacks foundation.

3            THE WITNESS:  Albert Viramontes.

4    BY MR. KISH:

5        Q    Did he say when Mr. Viramontes had told him to

6    falsify employee time records?

7            MR. AHEARN:  Vague, lacks foundation.

8            THE WITNESS:  No.

9    BY MR. KISH:

10       Q    Did you ask him when Alfred Viramontes had told

11   him to falsify employee time records?

12       A    No.

13           MR. AHEARN:  Vague, lacks foundation.

14   BY MR. KISH:

15       Q    I'm sorry if I sound weird because we're going to

16   be reading the transcript I'm trying to put information

17   into the question so I know this is not how we would have

18   a normal conversation about this.  I just want to tell you

19   that I don't always?

20           MR. AHEARN:  You don't always talk like this in

21   your private life.

22           MR. KISH:  I don't --

23           MR. AHEARN:  Because I did.

24           MR. KISH:  And the reason for that is so we don't

25   have to go back pages and pages to find out what we're

                                                          28

1    talking about.

Soto Daniel - ROUGH

2      THE WITNESS:  I understand.

3   BY MR. KISH:

4      Q      Did Ramon Cepeda tell you that anyone else had

5   instructed him to falsify Impact employee time records?

6      A      No.

7      Q      Did he ever tell you that any employee of

8   Schneider had instructed him to falsify employee time

9   records?

10          MR. AHEARN:  Vague, lacks foundation.

11          THE WITNESS:  Yes.

12  BY MR. KISH:

13     Q      When did he tell you that an employee at

14  Schneider had instructed him to falsify employee time

15  records.

16          MR. AHEARN:  Vague, lacks foundation, assumes

17  facts not in evidence, mischaracterizes testimony.

18          THE WITNESS:  It was after he confessed a month

19  after my investigation.

20  BY MR. KISH:

21     Q      Did he tell you who -- which employee of

22  Schneider had told him to falsify employee time records?

23          MR. AHEARN:  Vague, lacks foundation.

24          THE WITNESS:  No.

25

                                                        29

1   BY MR. KISH:

2      Q      Did he give you any names of anyone orange after

3   Fred Viramontes who instructed him to falsify employee

4   time records?

5      A      He did, but I can't remember the names.

                        Page 26

Soto Daniel - ROUGH

6    Q    Do you know how many names he gave you?

7    A    Two.

8    Q    Two names in addition to Alfred Viramontes?

9    A    Yes.

10    Q    And were those names -- do you remember whether

11   those two additional people worked for Schneider?

12         MR. AHEARN:  Objection, vague, lacks foundation.

13         THE WITNESS:  Personally, me, no, I did not know.

14   BY MR. KISH:

15    Q    Well, did Ramon tell you which company those

16   other two people worked for?

17    A    Yes.

18    Q    Which company did he tell you they worked for?

19    A    Schneider Logistics.

20    Q    Did Ramon Cepeda tell you -- we're talking about

21   the two additional people that Ramon Cepeda told you that

22   instructed him to falsify employee time records did he

23   tell you which positions those two other people held with

24   Schneider?

25         MR. AHEARN:  Objection, compound, vague, lacks

                                                          30


1    foundation.

2         THE WITNESS:  No.

3    BY MR. KISH:

4    Q    Did he tell you that they were Schneider

5    managers?

6    A    No.

7         MR. AHEARN:  Objection, vague, lacks foundation.

8    BY MR. KISH:

                    Page 27

Soto Daniel - ROUGH

9    Q   Did he give you any information about what

10  position they held?

11    A   Either lead or supervisor.  I mean, I wasn't --

12  can't remember exactly there was somebody that he reported

13  the hours to.

14    Q   Do you know who Ramon Cepeda reported hours to?

15    A   No.

16    Q   Have you ever subsequently learned who Ramon

17  Cepeda reported hours to?

18    A   Not personally, not Ramon, no.

19    Q   Is there someone currently in the position that

20  Ramon held with Impact?

21        MS. COSTANTINO:  Objection, vague, ambiguous

22  overbroad.

23        THE WITNESS:  No.

24        MS. COSTANTINO:  Lacks foundation.  Sorry.

25

                                         31

1  BY MR. KISH:

2    Q   So, let's go back.  After -- during the course of

3  this investigation, is it accurate to say that you

4  reported back to Mr. Welch?

5    A   Yes.

6    Q   How often did you report back to Mr. Welch?

7    A   Daily basis.

8    Q   And did anyone make any decisions about -- did

9  anyone make any decisions as a result of your

10  investigation?

11        MS. COSTANTINO:  Objection, speculation.

12        MR. AHEARN:  Join.  Vague.

Page 28

Soto Daniel - ROUGH

1      Q     And what hours were written down -- did you come
2      to an understanding about whether people were writing down
3      hours accurately on the DOL forms before you began your
4      investigation?
5             MS. COSTANTINO:  Lacks foundation.  Go ahead.
6             THE WITNESS:  Say it again.
7      BY MR. KISH:
8      Q     While investigating did you come to an
9      understanding about whether hours were being written down
10     on Impact employees DOL forms that were the correct hours
11     that they worked?
12     A     Not on the DOL forms.  On the DOL forms from what
13     I noticed the hours with that were being reported on as
14     far as the trailers, the unload time that was being
15     reported correctly.  It was the hours after the fact being
16     reported to Schneider was incorrectly.
17     BY MR. KISH:
18     Q     Did you understand how the hours were reported to
19     Schneider after being recorded on the DOL forms?
20     A     Yes.
21            MR. AHEARN:  Vague, lacks foundation.
22     BY MR. KISH:
23     Q     How did that happen?
24     A     There is a sheet that had a total of all the
25     trailers that we off-loaded and on that sheet on the very

                                                              100

1      bottom of it they would write down total man-hours and
                        Page 89

Soto Daniel - ROUGH

2  then that sheet would be turned into Schneider management.

3  BY MR. KISH:

4      Q     Who prepared that sheet?

5      A     The supervisors.

6      Q     Would that be Ramon Cepeda?

7      A     It would be Ramon and the leads.  It was --

8      Q     And do you know how frequent had I they turned

9  that sheet into Schneider supervisors?

10     A     Every day.

11     Q     Do you know why the hours -- do you have any

12  understanding about why the hours that they would report

13  on this sheet given to Schneider would be different than

14  the hours that they were recording on the DOL sheets for

15  Impact?

16     A     Only what they told me, the reason why was

17  Schneider had to report to Walmart low hours low man-hours

18  and they told Ramon and they told me that that's basically

19  Schneider informed them hey you've got to make sure it's

20  two or two and a half hours being reported.

21     Q     Who told you that the reason hours were being

22  reported on these man-hour sheets was because Schneider

23  needed to report low hours to Walmart?

24     A     It was Ramon Cepeda and I kind of got like a

25  brief understanding from Edgar; can't really recall the

101

1  conversation that I had with him but I know he did inform

2  me that they -- that he had to report the two, two and a

3  half hours.

4      Q     And you gained this information over the course

5  of talking to Ramon and Edgar in your investigation?

Page 90

16

Soto Daniel - ROUGH

6      A     Just through the investigation.  Not on the first
7  day they didn't tell me everything exactly so I would
8  learn the process find out what paperwork they were using
9  and so when I saw that they were turning in a paper to
10  Schneider management I asked them what it was I saw the
11  hours -- I asked them what were these hours and they told
12  me these are the un loads -- these are the man-hours that
13  we did and then I said well let me take a look at your DOL
14  and I looked at their DOL and I said well these man-hours
15  don't match what you're reporting why and that's why they
16  informed me letting me know what they were told that they
17  were to report two and two and a half hours.
18      Q     At some point you actually observed Impact leads
19  preparing these man-hour forms to give to Schneider
20  supervisors that had different hours, different man-hours
21  than those that the leads were reporting on the DOL forms?
22      A     Yes.
23      Q     How often -- did you see that more than once?
24      A     Yes.
25      Q     How often did you see that happen?

102

1      A     Probably after the first day, probably took a
2  couple days before I put a stop to it, so probably within
3  two, three days it was done.  I saw it you know because
4  not everybody kind of grasped the concept of it until I
5  forced it and I said you guys have got to stop reporting
6  these incorrect hours.  You have to report what's the
7  actual hours from the DOL.
8      Q     At any point did you -- have you had any

Page 91

Soto Daniel - ROUGH

2      Q    And why did you believe that to be so?

3      A    Because we receive an email from a lady named

4   Veronica who works at Schneider and we also report weekly

5   hours to her and she expressed to us that it was very

6   important for us to give her these hours by a certain time

7   Monday morning because they have a meeting with Walmart

8   and hours are -- I guess they have a conference and hours

9   are reported to Walmart.

10     Q    Do you recall when Veronica sent this email?

11     A    No, I do not.

12     Q    Was it your understanding that there is a weekly

13  meeting with Walmart between Schneider and Walmart?

14          MR. AHEARN:  Vague, lacks foundation.

15          THE WITNESS:  Yes.

16  BY MR. KISH:

17     Q    Did you discuss that weekly meeting with Vince

18  Redgrave on the telephone?

19     A    No.

20     Q    Have you ever received any other communications

21  from Veronica about Walmart?

22     A    No.

23     Q    I'm going to mark Exhibit 76.

24  BY MR. KISH:

25     Q    If you'll please just read that.  This document

164

1   is Bates stamped Impact 241 and 242.  Do you recognize

2   this document?

3      A    Yes.

4      Q    Can you tell me what it is?

5      A    It's an email from Vince letting us know what

Page 146

Exhibit 2

**Archived:** Tuesday, April 17, 2012 2:27:48 PM
**From:** Danny Soto
**Sent:** Wednesday, November 30, 2011 4:50:03 PM
**To:** James Welch; Brett Veach
**Subject:** FW: Productivity measure
**Response requested:** No
**Importance:** Normal

Vince,

Looking at the productivity report spread sheet I noticed that the hours went up on week 42.  That is week 10-17-11 to 10-23-11.  We went hourly on week 47 (11-21-11 to 11-27-11).  The spike that you see on week 42 is because the actual hours per trailer were reported correctly.  Because of the situation with the department of labor I arrived on 10-17-11 and found out prior to my arrival Impacts leads and supervision were instructed to only report between 2 to 3 hrs per trailer regardless of how long our associates spent in the trailers.  I spoke to Ramon as to why are we not reporting the correct hours and he said that he was instructed by Schneider supervision.  I told him that we need to report the correct hours.  As of week 42 we began to report the actual hours it took to offload the containers.

We can assure you that on a local level we will monitor our employees to perform efficiently and be cost effective as possible.  We have noticed from a select few individuals that they are not performing at the level of Impacts expectation as prior to the hourly change.  We have included more supervision and leads on the floor to motivate and monitor our associates.  We will be implementing Impacts point system and hold associates accountable for poor performance on Monday 12-5-11.

Regards,

Daniel Soto
Director of Operations
Impact Companies
717-577-4503

www.loadingservice.com

**From:** Redgrave, Vincent [mailto:RedgraveV@schneider.com]
**Sent:** Wednesday, November 30, 2011 2:10 PM
**To:** Danny Soto; Brett Veach
**Cc:** Hedges, Mark; Pickens, Mike
**Subject:** Productivity measure

Guys,

    Please be aware that since switching to an hourly rate the unload productivity has dropped dramatically

IMPACT 000641

from your team. Whilst we can understand some slow down, I need your help to continue to drive productivity. As there is now a direct correlation with hours and cost I also need your help in providing a cost effective service to our business.

Please let us know how you intend to manage at a local level on the floor to achieve this?

We did not include any of the annual event freight as this would have a further negative effect. The information below is building 1 and 5 only.

Thanks, Vince

*ML 5 1st Impact Productivity*

| Week | Hours | Cases Off Loaded | CPH |
|------|-------|------------------|-----|
| 36 | | | |
| 37 | | | |
| 38 | | | |
| 39 | | | |
| 40 | | | |
| 41 | | | |
| 42 | | | |
| 43 | | | |

*ML 5 1st Impact Productivity*

| Week | Hours | Cases Off Loaded | CPH |
|------|-------|------------------|-----|
| 36 | | | |
| 37 | | | |
| 38 | | | |
| 39 | | | |
| 40 | | | |
| 41 | | | |
| 42 | | | |
| 43 | | | |

**Vince Redgrave**
General Manager
Schneider Port Logistics
Mira Loma
redgravev@Schneider.com
Office: 951 360 5090
Cell: 951 903 6787

CONFIDENTIAL/ATTORNEYS' EYES ONLY

Exhibit 3

1   THERESA M. TRABER (SBN 116305)
2   LAUREN TEUKOLSKY (SBN 211381)
    Traber & Voorhees
3   128 N. Fair Oaks Avenue, Suite 204
    Pasadena, California 91103
4   Telephone: (626) 585-9611
    Facsimile: (626) 585-1400
5   tmt@tvlegal.com
    lt@tvlegal.com
6

7   JANET HEROLD (SBN 186419)                MICHAEL RUBIN (SBN 80618)
    Special Counsel to Change to Win, CLC    JONATHAN WEISSGLASS
8   2629 Foothill Blvd #357                    (SBN 185008)
    La Crescenta, California 91214           JENNIFER SUNG (SBN 254741)
9   Telephone: (818) 957-7054                Altshuler Berzon LLP
    Facsimile: (818) 542-6419                177 Post Street, Suite 300
10  heroldj@seiu.org                         San Francisco, California 94108
                                             Telephone: (415) 421-7151
11                                           Facsimile: (415) 362-8064
12  (Add'l counsel on next page)             mrubin@altber.com
                                             jweissglass@altber.com
13                                           jsung@altber.com

14                      Attorneys for Plaintiffs

15                 UNITED STATES DISTRICT COURT

16               CENTRAL DISTRICT OF CALIFORNIA

17                       EASTERN DIVISION

18  EVERARDO CARRILLO, *et al.*, for    )  Case No. CV 11-8557 CAS (DTBx)
19  themselves and all others similarly )
    situated and the general public,    )  **DECLARATION OF RAMON**
20                                       )  **CEPEDA RE: PLAINTIFFS'**
                     Plaintiffs,         )  **CONSOLIDATED REPLY**
21                                       )  **MEMORANDUM OF POINTS**
         v.                              )  **AND AUTHORITIES IN**
22                                       )  **SUPPORT OF MOTION FOR**
    SCHNEIDER LOGISTICS, INC.,           )  **PRELIMINARY INJUNCTION**
23  *et al.*,                            )  **ENJOINING RETALIATORY**
                                         )  **MASS TERMINATION**
24                  Defendants.          )
25                                       )  Date:  January 30, 2012
                                         )  Time:  10:00 a.m.
26                                       )  Courtroom: 5
                                         )  The Hon. Christina A. Snyder
27                                       )
28

1   <u>Additional counsel for plaintiffs:</u>

2

3   GUS T. MAY (SBN 159436)
    KEVIN R. KISH (SBN 233004)
4   MATTHEW E. DECAROLIS (SBN 238595)
5   Bet Tzedek Legal Services
    3435 Wilshire Blvd., Suite 470
6   Los Angeles, CA  90010
7   Telephone: (323) 939-0506
    Facsimile: (213) 384-3524
8   gmay@bettzedek.org
9   kkish@bettzedek.org
    mdecarolis@bettzedek.org
10

11   SANDRA C. MUÑOZ (SBN 190404)
12   Law Offices of Sandra C. Muñoz
    5429 E. Beverly Blvd.
13   Los Angeles, CA 90022
14   Telephone: (323) 720-9400
    Facsimile: (323) 720-9090
15   scm4law@att.net

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF RAMON CEPEDA

I, Ramon Cepeda, hereby declare as follows:

1. I am a former employee of Impact Logistics, Inc. I was hired in early 2001, and worked in the warehouses located at 4100 and 4250 Hamner Avenue and 11900 Riverside Drive in Mira Loma, California (the "Mira Loma warehouses") for more than 10 years, until November 10, 2011. The information contained in this declaration is based on my personal knowledge. If called as a witness, I could and would competently testify to the following matters.

2. When I first started working at Impact, I worked as a "lumper," and my primary duty was to unload trucks. Approximately eighteen months or two years after I commenced work with Impact, in or about 2003, I became a lead. In or about 2007, Impact promoted me into the position of supervisor. As supervisor, I was responsible, as part of my duties, for supervising the work of the warehouse workers hired through Impact who worked in Buildings 1, 4, and 5. When I became a supervisor, I reported to Alfred Viramontes, Impact's Operations Manager. When Alfred was out of the office for any reason, such as vacation or business travel to Tennessee, I filled in for him.

3. Schneider took over operation of the warehouse in about 2006. When I became a supervisor shortly after that, Schneider managers and supervisors regularly gave me directions about how Impact should do the work at the warehouses. The Schneider supervisors and managers had my cell phone number and I spoke to them many times in person or on the phone each day. Schneider supervisors often told me how many employees should be used in each building, and specified the start time for all Impact workers. On occasion, Schneider supervisors gave me directions as to the pace that Impact workers should work and sometimes told me to slow down the pace of the work, even though the workers were being paid by piece.

Decl. of RAMON CEPEDA;
Case No. CV11-8557 CAS (DTBx)

1   4.   Often on Mondays, I met with the Schneider managers who told me how
2   many containers to expect that week and how many employees Impact would likely
3   need to handle the upcoming work.  Schneider provided me with training materials
4   regarding safety for Impact employees and Schneider supervisors sometimes made
5   suggestions on safety, such as not wearing tank tops.  Schneider's General Manager,
6   Vince Redgrave, also sent emails to Impact with projections about the number of
7   containers we could expect to receive.  The secretary in the office gave me copies of
8   the emails.  As best as I can recall, his emails occasionally contained staffing
9   recommendations.

10   5.   Schneider managers and supervisors set productivity standards for all
11   warehouse workers in the Mira Loma warehouses, including the workers hired
12   through Rogers/Premier and Impact.  Schneider supervisors reminded me about the
13   standard that each employee should unload 620 cases per hour (a "case" is a box).
14   Every day, Impact had to report to Schneider how many hours Impact's employees
15   worked and how many containers were unloaded.  Schneider supervisors repeatedly
16   told me to have my leads report fewer hours:  I understood that the reason for this
17   instruction is that if we did not report fewer hours, Schneider would not meet its 620
18   CPH requirement.  I also remember Schneider supervisors instructing me to report
19   two hours per truck container unloaded, regardless of the actual time spent and even
20   though most containers take far longer to unload than two hours.  Schneider
21   supervisors also told me on several occasions to assign a certain lead worker to a shift
22   because they thought that particular lead would report lower hours than another lead
23   might report, for the workers on those shifts.

24   5.   On several occasions, Schneider managers or supervisors advised me that
25   they did not like a particular Impact employee, and instructed me to terminate that
26   employee's work in the Mira Loma warehouses.  I remember this happening more
27
28

Decl. of RAMON CEPEDA;
Case No. CV11-8557 CAS (DTBx)

002

1   than ten times.  When Schneider did not want an Impact worker, my orders from
2   Alfred were not to argue with Schneider management but to terminate the worker.
3   Alfred told me that if Schneider wanted something, we had to make it happen.  If
4   Schneider did not want a particular worker, we could not send that worker back to the
5   Schneider warehouse.

6       6.   One of the Impact workers whom Schneider told us to let go was Evaristo
7   Morales.  Evaristo was a lead for Impact, and a very good worker.  Just prior to
8   Schneider's instruction to terminate him, Evaristo and a group of his coworkers had
9   come together and asked Impact to increase by $5 their price for putting pallets on
10  top of the racks.  Alfred asked me about this request and I told Alfred that I thought
11  that what Evaristo and his coworkers were asking for was more than fair because that
12  particular task required about an hour of work to perform.  Soon after Evaristo and
13  his coworkers made this request, Schneider manager Vince Davis sent an email to
14  Alfred instructing him to get rid of Evaristo.  I was in Impact's office when the email
15  arrived and I read the email in Alfred's office.  Alfred and I met with Evaristo before
16  the shift began the next day to tell him he had been terminated.  Alfred told him
17  something like, "Schneider doesn't want you here anymore."

18      7.   The California Department of Labor raided the Mira Loma warehouses on
19  October 12, 2011.  After the raid, I was approached by Carlos, a Schneider building
20  manager who worked in Building 5.  He directed me to make sure that I assigned
21  Juan Chavez, an Impact employee, to work in a corner of the warehouse because he
22  did not want Juan to have the ability to pass out flyers or to talk to coworkers.  At the
23  time, there were flyers being circulated in support of the lawsuit.  He said something
24  about putting Juan Chavez to work in a corner so Juan can do his job but would not
25  be able to pass flyers or talk to other workers.

26

27

28

Decl. of RAMON CEPEDA;
Case No. CV11-8557 CAS (DTBx)

1     9.  After the Labor Department raid, some of the Impact and Rogers-Premier

2    workers filed a lawsuit.  It was common knowledge around the warehouses that many

3    more Rogers-Premier workers were involved in the lawsuit, in part because a flyer

4    was given out showing the photos of the workers involved, and there were pictures of

5    many Rogers-Premier workers on the flyer, but only one Impact worker, Juan

6    Chavez.  After the lawsuit was filed, Sal Villalobos, a Schneider supervisor, told me

7    to keep our people away from the Rogers folks.  He said that he didn't want Impact

8    workers to get involved in all of the problems going on.   He directed me to tell him if

9    I saw anyone -- workers hired through Rogers, Impact, or directly by Schneider --

10    handing out flyers or talking to the people involved in the lawsuit.  He said they

11    would take any workers doing that to the office and coach them (discipline them).

12     10.  During the Labor Department raid, I was one of the employees who spoke

13    to the investigators.  Alfred told me to be careful about what I told them and at one

14    point told me to stop talking with them.  Impact terminated my employment on

15    November 10, 2011, less than one month after I had cooperated with the DLSE

16    investigators.

17     I declare under penalty of perjury under the laws of the United States that the

18    foregoing is true and correct.

19     Executed this _9_ th day of January 2012, in _River Side_ , California

20

21

22                   _Ramon Cepeda_

23                 Ramon Cepeda

24

25

26

27

28

Decl. of RAMON CEPEDA;
Case No. CV11-8557 CAS (DTBx)

Exhibit 4

1   DOUGLAS J. FARMER, State Bar No. 139646
    douglas.farmer@ogletreedeakins.com
2   OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
3   Steuart Tower, Suite 1300
    One Market Plaza
4   San Francisco, CA  94105
    Telephone:  415.442.4810
5   Facsimile:  415.442.4870

6   BETSY JOHNSON, CA Bar No. 119847
    betsy.johnson@ogletreedeakins.com
7   TRUC T. NGUYEN, CA Bar No. 257262
    truc.nguyen@ogletreedeakins.com
8   OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
9   400 South Hope Street, Suite 1200
    Los Angeles, CA  90071
10  Telephone:  213.239.9800
    Facsimile:  213.239.9045
11
    Attorneys for Defendants
12  SCHNEIDER LOGISTICS, INC. and
    SCHNEIDER LOGISTICS TRANSLOADING
13  AND DISTRIBUTION, INC.

14              UNITED STATES DISTRICT COURT

15      CENTRAL DISTRICT OF CALIFORNIA EASTERN DIVISION

16

17  EVERARDO CARRILLO;              Case No. CV 11-08557 CAS (DTBx)
    FERNANDO CHAVEZ; ERIC
18  FLORES; JOSE MARTINEZ ARCEO;    DEFENDANTS SCHNEIDER
    BALTAZAR ZAVALA; AND JUAN       LOGISTICS, INC.'S AND SCHNEIDER
19  CHAVEZ, FOR THEMSELVES AND      LOGISTICS TRANSLOADING AND
    ALL OTHERS SIMILARLY            DISTRIBUTION, INC.'S SUR-REPLY
20  SITUATED AND THE GENERAL        IN OPPOSITION TO PLAINTIFFS'
    PUBLIC,                         MOTION FOR PRELIMINARY
21            Plaintiffs,           INJUNCTION AS A RESULT OF NEW
          v.                        EVIDENCE AND LEGAL
22                                  ARGUMENTS SET FORTH BY
    SCHNEIDER LOGISTICS, INC.;      PLAINTIFFS
23  SCHNEIDER LOGISTICS
    TRANSLOADING AND
24  DISTRIBUTION, INC.; PREMIER     Hearing Date:    January 30, 2012
    WAREHOUSING VENTURES, LLC;      Time:            10:00 a.m.
25  ROGERS-PREMIER UNLOADING        Complaint Filed: October 17, 2011
    SERVICES, LLC; IMPACT           Trial Date:  None Set
26  LOGISTICS, INC., AND DOES 1-15, District Judge:    Hon. Christina A. Snyder
              Defendants.           Mag. Judge: Hon. David T. Bristow
27

28

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 37 of 78   Page ID
#:4937
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 2 of 19   Page ID
#:2929

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION.................................................................................1

II.   SUMMARY OF RELIEF SOUGHT .......................................................2

III.  LEGAL ARGUMENT ........................................................................3

    A.   Plaintiffs Seek New, Extraordinary Relief Concerning SLI
        and SLTD That Alters Rather Than Maintains the "Status
        Quo" And Must Be Denied................................................................3

    B.   Plaintiffs Now Seek New Relief Based on Conflicting
        Testimony. ...................................................................................5

    C.   Plaintiffs Now Present and Mischaracterize New Evidence ..........5

        1.   The New Evidence Does Not Establish Retaliation
            or Pretext..........................................................................9

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akiona v. United States,*
    938 F.2d 158 (9th Cir. 1991) ............................................. 13

*Bonnette v. Cal. Health and Welfare Agency,*
    704 F.2d 1465 (9th Cir. 1983) .......................................... 6

*Briones v. Grannis,*
    2010 WL 3636139 (C.D. Cal. Sept. 14, 2010) ...................... 3

*GoTo.com, Inc. v. Walt Disney Co.,*
    202 F.3d 1199 (9th Cir. 2000) .......................................... 3

*Holtzclaw v. Certainteed Corp.,*
    795 F. Supp. 2d 996 (E.D. Cal. 2011) ........................... 9, 11

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir. 2009) ........................................... 3

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ......................................................... 9

*Mercy Catholic Med. Ctr. v. Thompson,*
    380 F.3d 142 (3rd Cir. 2004) .......................................... 13

*NLRB v. Gissel Packing Co.,*
    395 U.S. 575 (1969) ........................................................ 12

*State of Nev. v. Watkins,*
    914 F.2d 1545 (9th Cir. 1990) .......................................... 5

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004) ............................................... 4

*Tanner Motor Livery, Ltd. v. Avis, Inc.,*
    316 F.2d 804 (9th Cir. 1963) ........................................... 3

*Thomas v. County of Los Angeles,*
    978 F.2d 504 (9th Cir. 1993) ........................................... 5

*Transwestern Pipeline Co. v. 17.19 Acres of Property*
    *Located in Maricopa County,* 550 F.3d 770 (9th Cir. 2008) .......................... 3, 4

*U.S. v. Int'l Union of Petroleum and Indus. Workers, AFL-CIO,*
   870 F.2d 1450 (9th Cir. 1989) .............................................................. 13

*Villiarimo v. Aloha Island Air., Inc.,*
   281 F.3d 1054 (9th Cir. 2002) ................................................................ 9

*Winarto v. Toshiba America,*
   274 F.3d 1276 (9th Cir. 2001) .............................................................. 10

*Yartzoff v. Thomas,*
   809 F.2d 1371 (9th Cir.1987) ................................................................ 9


**OTHER AUTHORITIES**

Fed. R. Civ. P. 34(a)............................................................................. 12

**SUR-REPLY IN OPPOSITION OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I.   **INTRODUCTION**

Plaintiffs masquerade their original motion for preliminary injunction as a request to maintain the status quo when, in fact, they really seek affirmative action from Schneider Logistics, Inc. ("SLI") and Schneider Logistics Transloading and Distribution, Inc. ("SLTD") ("Defendants"). Such mandatory injunctions are disfavored by the courts and therefore subject to a heightened standard of scrutiny. Accordingly, this Court must deny the Plaintiffs' request for a mandatory injunction "unless the facts and the law clearly favor" the moving party.

Plaintiffs elected to file their motion presuming that SLTD and Premier conspired to displace the Premier employees who had complained. They requested and were granted the extraordinary opportunity to depose numerous witnesses on essentially no notice to attempt to support their conspiracy theory. The Court gave them every opportunity to garner support for their original motion. Having found not a shred of evidence of any complicity between Premier and Schneider regarding Premier's decision to walk away from this type of business in Savannah, GA, Elwood IL and Mira Loma CA, they now are in essence abandoning their earlier request for relief and are again attempting to bypass any normal review of the underlying facts of the case.

Here, Plaintiffs have not offered a single case on point and Defendants have found no cases that authorize a court to *affirmatively* require an entity to directly hire the employees of a third-party contractor. Similarly, Plaintiffs cannot offer a single case on point that Defendants' non-action with respect to Premier Warehousing Ventures, LLC's ("PWV") termination of its contract with SLTD constitutes an adverse employment action that is retaliatory. Plaintiffs make arguments by analogy alone, and such analogies are misplaced and without legal support.

Finally, Plaintiffs have not proffered any evidence to substantiate their claims

1  of joint employment or retaliation by SLI and SLTD. Rather, Plaintiffs try to fit a

2  square peg into a round hole by continuing to misconstrue and often distort the

3  evidence to conform to their strained arguments.

4      The facts in this case are clear and indisputed: PWV terminated its service

5  contracts. It did so on its own, for business reasons, without the involvement of

6  SLTD or SLI. Plaintiffs have not, and cannot, show that SLTD or SLI were involved

7  with PWV's decision.

8
## II.    <u>SUMMARY OF RELIEF SOUGHT</u>
9
10      In Plaintiffs' Notice of Motion and Motion for Preliminary Injunction

11  Enjoining Retaliatory Mass Termination and for Provisional Class Certification,

12  Plaintiffs move <u>only</u> for the following:

13          "[A] preliminary injunction. . . to restrain [SLTD and SLI] and

14          [PWV and Rogers-Premier Unloading Services] from proceeding

15          with the unlawful mass retaliatory termination of Schneider-

16          Premier class members. . . (Notice (Dkt. 117), 1.)

17  Plaintiffs <u>did not</u> file a proposed order.

18      Throughout Plaintiffs' Reply Brief, Plaintiffs give little attention to its initial

19  request but instead, for the first time, ask this Court to impose a mandatory

20  injunction on SLI and SLTD. Specifically, Plaintiffs assert:

21      • "The Court can issue an injunction . . . without ordering Premier to

22        reinstate its contract." (Reply Brief (Dkt. 159), 2.)

23      • "Schneider has ...options ...for protecting jobs of the Schneider-

24        Premier Workers... It could preserve the jobs of the Schneider-

25        Premier workers by retaining them as Schneider's direct employees.

26        Or, Schneider could continue those workers' employment by having

27        them work for a new subcontractor." (Reply Brief (Dkt. 159), 15.)

28      • "Schneider has made no effort to absorb the Premier workforce into

      its own ranks to serve as direct employees. . ." (Reply Brief (Dkt.

159), 20.)

- "It would be to [SLI's and SLTD's] benefit to require a new contractor to retain the Schneider-Premier workforce…" (Reply Brief (Dkt. 159), 20.)

## III.   LEGAL ARGUMENT

### A.   Plaintiffs Seek New, Extraordinary Relief Concerning SLI and SLTD That Alters Rather Than Maintains the "Status Quo" And Must Be Denied.

The function of a preliminary injunction is to preserve the status quo ante litem. *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963).  *See also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to "the last uncontested status which preceded the pending controversy"). Injunctions that require some *affirmative action* or a *specific act*, however, are considered "mandatory injunctions" and disfavored.   Moore's Federal Practice, § 65.04[1]; *Briones v. Grannis*, 2010 WL 3636139, at *4 (C.D. Cal. Sept. 14, 2010) (citing *Dahl v. Hem Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (a mandatory injunction is a preliminary injunction that alters the status quo by commanding a positive act)). Because mandatory injunctions go "well beyond simply maintaining the status quo, they are particularly disfavored in the law." *Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa County*, 550 F.3d 770, 776 (9th Cir. 2008).

Moreover, mandatory injunctions are ordinarily "not granted unless extreme or very serious damage will result and **are not issued** in doubtful cases or where the injury complained of is capable of compensation in damages."   *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (emphasis added). Therefore, requests for mandatory injunctions are subject to "heightened scrutiny." *Transwestern Pipeline Co.*, 550 F.3d at 776.   A court **must deny** the preliminary injunction "unless the facts and the law clearly favor the

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 43 of 78   Page ID
#:4943
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 8 of 19   Page ID
#:2935

1   moving party." *Id.* In fact, where the injunction is "mandatory," "[t]he party seeking

2   the injunction must show a 'clear' or 'substantial' likelihood of success." *Sunward*

3   *Elecs., Inc. v. McDonald*, 362 F.3d 17, 24-25 (2d Cir. 2004). This is because the

4   mandatory injunction *alters*, rather than maintains, the status quo. *Id.* at 24.

5        In *Anderson v. United States,* the Ninth Circuit reversed both a mandatory and

6   a prohibitory injunction imposed on an employer by the district court. 612 F.2d

7   1112 (9th Cir. 1979). The Ninth Circuit concluded that *requiring* the employer to

8   hire the plaintiff prior to the adjudication of her discrimination claim on the merits

9   was an internal interference imposed by the courts on facts and law not clearly

10  favoring the plaintiff's position and, accordingly, constituted an abuse of discretion.

11  *Id.* at 1115. Further, the court held that the plaintiff's claim of discrimination in not

12  being hired for a particular job could be adequately compensated by retroactive

13  promotion and back pay in the future. *Id.*

14       Similarly, in *Stanley v. University of Southern California*, the Ninth Circuit

15  addressed the issue of mandatory preliminary injunction centered on a plaintiff's

16  claims of sex discrimination and retaliation. 13 F.3d 1313, 1320 (9th Cir., 1994)

17  There, the plaintiff sought a mandatory injunction requiring that the employer hire

18  her pending the outcome of her lawsuit. The Ninth Circuit affirmed the district's

19  court denial of the injunction, concluding that mandatory injunctions are subject to a

20  higher degree of scrutiny and are disfavored under the law of this circuit. The Ninth

21  Circuit likewise concluded that the plaintiff's remedy at law was money damages

22  and back pay. *Stanley*, 13 F.3d at 1324.

23       Here, like *Anderson* and *Stanley*, Plaintiffs request that the Court issue a

24  mandatory injunction to require SLI and SLTD to directly hire the employees

25  currently employed by PWV or, in the alternative, to enjoin SLI and SLTD to require

26  that successor vendors hire PWV employees. Plaintiffs' requested relief goes

27  beyond the status quo by commanding a positive act from SLI and SLTD. Like

28  plaintiffs in *Anderson* and *Stanley*, Plaintiffs are requesting a mandatory injunction

1   against SLI and SLTD before the adjudication of the underlying claims on the

2   merits, an approach disfavored in the Ninth Circuit.  Plaintiffs have not established

3   that the "facts and the law clearly favor the moving party." As demonstrated herein,

4   Plaintiffs' proffered facts are in dispute.  Moreover, Plaintiffs' claims, just like the

5   claims of plaintiffs in *Anderson* and *Stanley,* can be compensated in the form of

6   money damages. As such, Plaintiffs' mandatory injunction must be denied.

### B.   Plaintiffs Now Seek New Relief Based on Conflicting Testimony.

8   A preliminary injunction cannot be issued where there are disputed matters of

9   fact. *Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993).  If there

10  are disputed matters of fact, a district court must conduct evidentiary proceedings to

11  resolve any of the disputed matters before a court can issue a preliminary injunction.

12  *Id.* (concluding there is an insufficient basis for ordering injunction where parties

13  submitted diametrically opposite declarations).

14  In the present case, Plaintiffs and Defendants have submitted diametrically

15  opposing declarations and counter-declarations disputing alleged supervision of

16  PWV and Impact employees by Defendants supervisors, alleged disciplinary action

17  of PWV and Impact employees by Defendants' supervisors, alleged retaliatory

18  statements made by SLTD supervisors to PWV, Impact and SLTD employees.

### C.   Plaintiffs Now Present and Mischaracterize New Evidence

21  "It is improper for a moving party to introduce new facts or legal arguments in

22  the reply brief than those presented in the moving papers." *State of Nev. v. Watkins,*

23  914 F.2d 1545, 1560 (9th Cir. 1990).

### (a)   Plaintiff Misrepresents the Evidence Regarding SLTD's Leads and Supervisors

26  In an effort to establish a joint employer relationship, which does not exist

27  here, Plaintiffs resort to new and misleading evidence to do so.

28  The Ninth Circuit, in the context of the FLSA, on which Plaintiffs' claims are

1    in part based, looks to the "economic reality" behind a relationship in order to

2    determine whether a defendant is a joint employer. *Bonnette v. Cal. Health and*

3    *Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983). Courts consider whether the

4    alleged employee:  1) had the power to hire and fire the employees, 2) supervised

5    and controlled employee work schedules and conditions of employment, 3)

6    determined the rate and method of payment and 4) maintained employment records.

7    *Id.*  Defendants have meticulously considered the determinative factors of the

8    economic reality test in its previous filings, and demonstrated that such factors do

9    not support a finding of joint employment. (Dkt. 30; Dkt. 51; Dkt. 81)

10          Plaintiffs misrepresent evidence whether Defendants' lead employees are

11   supervisors.[1]  In their declarations, Plaintiffs contend that SLTD supervisors can

12   direct the termination of PWV or Impact employees.   Defendants have repeatedly

13   presented contradictory evidence:

- Redgrave testified that SLTD supervisors would never request the removal of a PWV employee (or Impact) since they have no authority to remove employees.  (Redgrave Depo., 68:17-23; 69:4-10; 69:22-70:4.) Redgrave observed that PWV makes the determination for themselves with their own employees. (Redgrave Depo., 69:4-10.)[2]

- Vincent Redgrave, SLI's and SLTD's Operations Manager, explained that area supervisors provide on a daily basis the volume of cases to be handled in order for PWV to determine how to direct their work. (Redgrave Depo. 73:9-25.)

- Redgrave testified that the leads are hourly associates, as opposed to the supervisors who are salaried, exempt employees. (Redgrave Depo.,

---

[1] Defendants have previously presented testimony in direct opposition of such claims that these SLTD supervisors supervise any of PWV's or Impact's employees. (Dkt. 82 & Dkt. 83).

[2] All deposition testimony and exhibits are attached to concurrently filed Declaration of Betsy Johnson ("Johnson Decl."), ¶¶ 4-7 at Exhibits A through D.  Deposition testimony is cited as "[last name of deponent] Depo. [page]:[line]."

56:18-57:2; 59:1-2.)[3]  More importantly, the hourly leads have no supervisorial authority and Plaintiffs have not provided any evidence that leads possess supervisorial authority.  Redgrave confirmed that the leads do not act in lieu of the supervisor, even where the supervisor is not available. (Redgrave Depo., 177:13-15.)

- Redgrave further explained that the leads perform the same regular warehouse duties as the other SLTD hourly employees. (Redgrave Depo., 176:24:177:7.) The difference is that the leads perform some general administrative work as completing paperwork related to containers and trailers. (*Id.*)

In addition, Plaintiffs' reliance on the testimony of Mark Hedges, SLTD's Assistant General manager, to establish that the leads were "supervisors" is misplaced and misrepresents to the Court what he actually said.

- Mark Hedges stated, "Now they would call them their leads and area managers. Before they were called supervisors." (Hedges Depo., 17:6-9.)  Hedge's statement that "they were called supervisors" refers to the area managers.  (Declaration of Mark Hedges ("Hedges Decl."), ¶ 4.)[4]. At most, Hedges statement may have been unclear, but in no way was it dispositive of the fact that Hedges meant that "leads" used to be called supervisors.

- Plaintiffs understood to whom Hedges was referring to when he said "they." Later in the deposition, Theresa Traber, Plaintiff's counsel asked, "And how about any of the area supervisors. . . or I guess you call them area managers." (Hedges Depo. 56:2-5.)

- Redgrave's deposition corroborates the correct reading of Hedges'

---

[3] Plaintiffs' assertion that he does not know what Schneider Supervisors did on a day-to-day basis is unfounded.

[4] All declarations cited in support of Defendants' Sur-Reply are filed concurrently herewith.

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 47 of 78   Page ID
#:4947
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 12 of 19   Page ID
#:2939

testimony that area managers were previously referred to as supervisors.
Redgrave often interchangeably uses "area managers" and with
"supervisors" in his deposition. (*See e.g.*, Redgrave Depo., 73:9-25.)

### (b)   Cepeda's Declaration Raises New Facts.

Cepeda's declaration alleges that  1) a SLTD manager, Vince Davis, sent an e-mail requesting Evaristo Morales' termination; 2) a SLTD manager, Carlos Cardenas, instructed Cepeda to assign Impact employee Juan Chavez to the corner of the warehouse so that he could not pass out flyers in the warehouse; and 3) a SLTD supervisor, Sal Villagomez[5] instructed Cepeda to keep Impact employees away from PWV employees and to inform him if any employees were handing out flyers and talking about the lawsuit so that he could discipline them.

The new information contained in Cepeda's declaration is incorrect:

- Vince Davis. Davis never had Alfred Viramontes' email address and, therefore, could not have sent an e-mail to Impact's supervisor requesting the termination of Impact employee Evaristo Morales. (Declaration of Vince Davis ("Davis Decl."), ¶ 6.) Davis only became aware that Mr. Morales and coworkers made a request for a raise for the first time through Cepeda's recently filed declaration. (Davis Decl., ¶ 7.)

- Carlos Cardenas. Cardenas has never directed Cepeda to assign Juan Chavez, or any employee for that matter, to the corner of a warehouse to prevent him form passing out flyers. (Declaration of Carlos Cardenas ("Cardenas Decl."), ¶ 4, 6.)  In fact, Cardenas has only spoken to Cepeda once concerning union flyers that were being distributed at the Mira Loma warehouse facility. (Cardenas Decl., ¶ 5.)  Cardenas' limited response was that the flyers were not permitted to be handed out inside the warehouse.  Cardenas also told Cepeda

---

[5] Cepeda's declaration refers to a Sal Villalobos, which Schneider assumes Cepeda is referring to Villagomez.

1  that he should handle the Impact employees as how he sees fit. (Cardenas
2  Decl., ¶ 5.)

3  • <u>Sal Villagomez.</u>[6] Villagomez never made any of the statements attributed to
4  him in Cepeda's declaration. (Declaration of Sal Villagomez ("Villagomez
5  Decl."), ¶ 7-9.) Villagomez has only spoken to Cepeda one time concerning
6  the lawsuit at issue and fliers being distributed at the Mira Loma warehouse
7  facility. (Villagomez Decl., ¶ 4.) At that time, Cepeda initiated the
8  conversation about the lawsuit and told Villagomez that there was union
9  activity occurring, that Impact employees were trying to bring a lawsuit
10  against Impact, and that union flyers were being passed out. The only response
11  Villagomez made was to ask Cepeda what he thought was going to happen as
12  a result of all the activity and the lawsuit. (Villagomez Decl., ¶¶ 4-5.)

### 1.    The New Evidence Does Not Establish Retaliation or Pretext

To establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.1987).   To establish causation, a plaintiff must show that "engaging in the protected activity was one of the reasons for his firing and that but for such activity he would not have been fired." *Villiarimo v. Aloha Island Air., Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002).

Once a plaintiff has established a prima facie case of retaliation, the burden shifts to the "employer" to establish a legitimate, non-discriminatory reason for the employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "The employer need only articulate, not prove a legitimate, non-discriminatory reason for deciding to terminate the plaintiff." *Holtzclaw v. Certainteed Corp.*, 795 F. Supp. 2d 996, 1011 (E.D. Cal. 2011).   Plainly, the decision to engage in a

28 ──────────────────

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 49 of 78   Page ID
#:4949
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 14 of 19   Page ID
#:2941

1   reduction-in-force because of economic reasons is a legitimate, non-discriminatory

2   reason. *Winarto v. Toshiba America*, 274 F.3d 1276, 1295 (9th Cir. 2001).

### (a)     The Failure to Offer A New Contract Is Not Pretextual

Plaintiffs claim that SLTD's and SLI's failure to offer a new contract is
pretextual. However, the facts contradict such an assertion:

- SLTD never initiated such offers with any of the contracts with
  PWV. In each instance where SLTD agreed to higher rates in
  Elwood and Savannah, it was because PWV initiated these requests.
  (Larson Depo., 82:20-84:20; 46:18-47:25; 49:12-50:4; 60:1-61:8.)

- With respect to the Mira Loma contract, PWV did not make any
  request to SLTD to increase rates at the Mira Loma

- Moreover, Plaintiffs ignore a fundamental fact – PWV did not want
  to renegotiate the contracts. Pittman testified that PWV had **"zero"**
  intention of discussing new contract terms to provide services to
  SLTD. (Pittman Depo., 143:19-22.)

Clearly, SLTD has no obligation to try to negotiate with an unwilling party.

### (b)     Defendants Are Not Obligated To Consider Other Options

Plaintiffs also make the convoluted argument that SLTD had "several options
for protecting the jobs of SLTD workers" and because SLTD did not do so, it was
evidence of retaliatory intent. However, Plaintiffs leap to this conclusion without
establishing that SLTD has *any* obligation to retain these employees or find
alternative work.  Plaintiffs assert that SLTD and SLI "cannot explain" why it
"spurned" various solutions of keeping PWV's employees. However, in reality,
SLTD and SLI do not have to explain because it has no requirement to retain PWV's
employees.  Plaintiffs cite no cases where a contractor must retain the employees of a
subcontractor.

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 50 of 78   Page ID
#:4950
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 15 of 19   Page ID
#:2942

Moreover, at this time, SLTD and SLI have made no determinations, one way or another, what they will decide to do come February 24, 2012. At the very least, Plaintiffs' argument that SLTD and SLI retaliated because they have not made a decision is absurd.

### (c)   PWV's Decision to Terminate the Contract is Legitimate.

In *Certainteed,* for example, the Eastern District of California granted summary judgment in favor of the employer on an age discrimination claim where the employer terminated the plaintiffs' employment in a reduction in force because of the economy. 795 F. Supp. 2d at 1012.   The *Certainteed* court reasoned that the employer honestly believed that downsizing was necessary because of the economy and, as a result, the court rejected the plaintiff's claim. *Id.* at 1013.

SLI and SLTD, of course, dispute that they employ any of the Plaintiffs. For the purpose of argument, however, PWV had presented a legitimate, non-discriminatory reason for Plaintiffs' termination: it terminated three contracts with SLTD because of the increasing workers' compensations incurred as a result of cross-docking services provided under the service contracts with SLTD. (Pittman Depo., 32:9-19.)  Like *Certainteed,* the PWV was no longer in a position where it made sense to perform under the contract.

Indeed, the evidence strongly showed that SLTD and SLI had nothing to do with the termination of the contract.  PWV sent a letter terminating the contract and this was the *first* time SLTD was made aware that PWV as terminating its contracts with SLTD.  (Redgrave Depo., 139:13-140:7; 141:3-7; Larson Depo., 111:9-13; 111:24-112:1; Pittman Depo., 39:22-40:4.)

There is no evidence that Defendants interfered with Plaintiffs' employment, served as agents, or induced the PWV to terminate Plaintiffs' employment. James Pittman testified that PWV made the determination based on the increasing workers' compensation costs that made the provision of cross-docking services to SLTD no

1   longer profitable. (Pittman Depo., 32:9-19.)  As previously noted, the letter
2   terminating the contract between SLTD and PWV was the first time SLTD became
3   aware of the letter.

4
5
          **(d)**     **Statements About Union Membership Are Not Retaliatory**

6
7       In their Reply Brief, Plaintiffs point to a statement made by Mark Hedges that
8   "naturally our company doesn't want to have a union. We're pro management."
9   (Hedges Depo., 46:6-22.)  Plaintiffs contend this new evidence shows retaliation.

10      It is well-settled that an employer is free to communicate to his employees any
11  of his general views about unionism or any of his specific views about a particular
12  union so long as the communications do not contain "a threat of reprisal or promise
13  of benefit." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).

14      At face value, Hedges' statement reflects the natural position of most
15  employers.  If this were not the case, voluntary union recognition would be the norm.
16  Moreover, even in the context of an unfair labor practice charge asserting a violation
17  of the National Labor Relations Act for making a coercive statement, Hedges'
18  statement alone would not be considered an indicator of retaliation or animus that
19  rises to the level of a "coercive statement."  Moreover, Hedges made this statement
20  in a deposition testimony, it was not even made to employees.

21            **(e)**     **The Failure to Obtain a Videotape Is Not Retaliatory.**

22      Another new argument set forth by Plaintiffs is that SLI's and SLTD's did not
23  obtain a videotape of the October 19, 2011 meeting from a third party security
24  company.  This makes no sense.

25      A party that has received a request for documents must produce only those
26  records which are in his "possession, custody, or control." Fed. R. Civ. P. 34(a).
27  Plaintiffs have no evidence that Defendants have possession or custody over the
28  videotapes.   The only issue then, is whether Defendants have control over the

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 52 of 78   Page ID
#:4952
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 17 of 19   Page ID
#:2944

1   videotapes.  Again, Plaintiffs have offered no evidence of control.

2       The Ninth Circuit has explained that "[c]ontrol is defined as the legal right to

3   obtain documents upon demand." *U.S. v. Int'l Union of Petroleum and Indus.*

4   *Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989).   The party seeking

5   production "bears the burden of proving that the opposing party has such control."

6   *Id.*   In *Int'l Union*, the Ninth Circuit concluded that the union did not have control of

7   the local union's records because the union constitution did not give the right to

8   obtain records on demand. *Id.* at 1452-53.   Like *Int'l Union*, Plaintiffs have not met

9   their burden of showing that Defendants had the right to obtain the videotapes on

10   demand.   Without such *legal* control, Plaintiffs' argument that Schneider has

11   demonstrated retaliatory intent by not providing the video simply makes no sense.

12       Plaintiffs' reliance on two cases for this new argument is misplaced.   *Mercy*

13   *Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3rd Cir. 2004), as cited by

14   Plaintiffs, is inapplicable because there, the party at issue had a legal right or ability

15   to obtain the documents from another source upon demand.   No such relationship

16   here exists between the Schneider and the third party security company. *Akiona v.*

17   *United States*, 938 F.2d 158, 161 (9th Cir. 1991) also is inapplicable because the case

18   specifically involved the destruction of evidence within the party's control.

19       In sum, Schneider did not "refuse" to provide the videotape.   Schneider did

20   not believe it was within the scope of the notice or the request for production and

21   offered to meet and confer with Plaintiffs on the issue. (Hedges Depo., 70:18-71:18.)

22           **(f)**    **SLI and SLTD's Concerns Regarding PWV's Service**

23                 **Failures**

24       Plaintiffs assert that SLTD's concerns regarding PWV's service failures were

25   pretextual and that SLTD was trying oust PWV and its workers out of the

26   warehouses, beginning just after the DLSE inspection on October 12, 2011.

27   However, the numbers demonstrate that the actual *work* was not being completed.

28       Plaintiffs rely on the fact that the productivity statistics SLTD examined show

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 53 of 78   Page ID
#:4953
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 18 of 19   Page ID
#:2945

1    an increase in recorded hours for workers. While the numbers do show an increase in
2    hours for workers, the numbers alone do not reveal anything else. Yet, Plaintiffs
3    presume that the increased hours were likely not a result of a decrease in
4    productivity, but a "new effort by warehouse supervisors to accurately record and
5    report all work hours."    Plaintiffs leap to this conclusion with a string of
6    presumptions and no factual support.

7         Plaintiffs' theory fails when considering the underlying facts.  Three to four
8    weeks after SLTD communicated to Premier its concerns about the productivity
9    level, the productivity level did improve. Moreover, since then, it has been generally
10   consistent. (Redgrave Depo., 119:9-25.)    If Plaintiffs' theory was valid, the
11   productivity level would not have not have improved if it were truly the fact based
12   on the fact of accurate reporting.

13        Further, the numbers are only secondary to what SLTD was observing with
14   respect to the work itself - that the work was not being completed.  In the same
15   communication to PWV, where SLTD raises a concern about the drop in
16   productivity information, SLTD expresses concern that SLTD had to have its own
17   team "over the weekend leading so that [SLTD] could complete loading in time."
18   (Johnson Decl., ¶ 7, Ex. E (SCH/LOMA000000223).).   Likewise, SLTD presented
19   several pages of deposition testimony indicating that the work was not being
20   completed, which Plaintiffs conveniently ignore. Redgrave testified that he observed
21   that SLTD's employees were incurring "overtime because they were having to wait
22   to perform certain [administrative] functions" which could not be performed until the
23   trailer loading was completed.   (Redgrave Depo., 105:21-108:4.)   The fact that
24   Impact did not incur productivity failures despite being cited by the DLSE also
25   challenges Plaintiffs' theory. (Redgrave Depo., 13:18-23; 82:1-9, 84:1-14.)

26        Based on the facts, the valid interpretation for the increase in hours is that
27   PWV slowed down their work and were taking longer to load a similar amount of
28   cases, to the point that they were not completing their work.

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 54 of 78   Page ID
#:4954
Case 2:11-cv-08557-CAS-DTB   Document 174   Filed 01/26/12   Page 19 of 19   Page ID
#:2946

1              **Requested Relief**

2              The Court should deny Plaintiffs' motion for a preliminary injunction against

3    SLI and SLTD.  Plainly, Plaintiffs seek a mandatory injunction and have not met

4    their burden for obtaining such relief.  In fact, to issue a mandatory injunction to

5    force Defendants to hire non-employees would fly in the face of all established

6    precedent.

7

8
     DATED:  January 26, 2012            OGLETREE, DEAKINS, NASH, SMOAK &
9                                        STEWART, P.C.

10                                       By:  /s/ Betsy Johnson
11                                            Douglas J. Farmer
                                              Betsy Johnson
12                                            Truc T. Nguyen

13                                       Attorneys for Defendants
                                         SCHNEIDER LOGISTICS, INC. and
14                                       SCHNEIDER LOGISTICS
                                         TRANSLOADING AND
15                                       DISTRIBUTION, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 5

**Archived:** Tuesday, April 17, 2012 2:27:52 PM
**From:** Warren Stevens (Vendor)
**Sent:** Thursday, October 20, 2011 1:16:56 PM
**To:** 'aviramontes@loadingservice.com'
**Cc:** Carlos Cardenas - c2carde; Sal Gutierrez (Vendor); Juliana Torres (Vendor)
**Subject:** RE: ⌐
**Importance:** Low

Alfred,
        Based on the statements below we are requesting tha⌐          not be allowed back on our campus to perform work for our organization.

Thank you,

Warren

***Warren Stevens*** • *Schneider Port Logistics - Senior Area Manager • Wal-Mart IDC 6060 • 4250 S. Hamner Ave Mira Loma, CA 91752 • Office 951.360.5064*

**From:** Juliana Torres (Vendor)
**Sent:** Thursday, October 20, 2011 1:05 PM
**To:** Warren Stevens (Vendor)
**Subject:** Cristian Castro

Warren,

As mentioned to you earlier today.

I witnessed on Monday 10/17/11 Impact associate              ⊃ enter ML5 at the same time as another associate from Impact. Upon entering Mike the security asked them both to sign in. The other associate stopped and began to sign in and ⌐ ⌐ ⌐ ⌐ ↄ started to walk away. The Impact associate told he to come back because he needed to sign in and           ↄ continued to walk ignoring what was being told to him. I walked behind him to get his attention because Mike took it as he didn't understand him since he was Spanish speaking only. I called for him twice and he turned once looked at me and continued walking. I followed him in to the break room where Gus Arroyo was standing by the door and Gus noticed I was trying to get ⌐          , attention so he called out for and asked him if

IMPACT 000730

couldn't hear that I was calling for him. Gus told _____ n that he either cooperated with
me or that he would send him home. Ramon (Impact Supervisor) was in the break room
and heard what was going on so he came out of the break room with ⌐        I proceeded
to ask        n if he signed in and he said he did. Since I was standing by the door and saw
him walk away without signing in I asked him to show me where he signed in at. _
walked with Ramon and myself to the sign in sheet. Needless to say he didn't sign in. I
explained to him the procedures he needed to follow when entering the building in front
of Ramon and he agreed to follow them.

Yesterday 10/18/11 while conducting an investigation for an incident regarding the
freight _____ ⌐ was offloading from door 576. The associate involved mentioned that her
and the slotter for the door spoke to         regarding switching from pallets to tier racks
due to where the system was sending the freight to be put away, but        replied he
wasn't going to do what they were asking and continued to work. He then started to use
the tier racks but was staging them incorrectly on the dock. They approached         once
again but he ignored them and said he was doing them correctly. Since he was not
cooperating the Schneider associates they went to their Floor Lead Araceli Aguilar. She
approached        and showed him the incorrect way of staging freight and how he was
expected to stage them. (        then continued to work and start staging the freight
correctly.

Today 10/19/11 I was approached by Sally Fregoso who made a comment regarding the
unloader at door 566 where she was slotting the freight. She mentioned that the unloader
was wearing his shorts half way down his rear end and she spoke to Edgar an Impact Lead
regarding the unloader and he went and spoke to '_        ı and asked him to pull his shorts
up. The unloader pulled his shorts up but lowered them once again later in the morning.
Sally approached        and asked him to please pull his shorts up and he mumbled
something back at her and continued what he was doing ignoring her request. Warren and
I made our way to door 566 to confirm whether or not it was the same associate that was
giving us other issues. When we approached the door we went to speak to (
who was working in the dark. The light fixture at the door was turned on but was pointing
outside of the door. I aske him how long had he been working here and if he knew the
correct procedure. He said yes but decided not to turn the light on because the container
was too hot. I told him he needed to have the light for safety measures and told him to
turn on the fan attached to the light fixture. As I exited the container we pointed the light
fixture to the container and turned the fan on for him.

We spoke to Edgar once again regarding this associate, and told him Warren will be
contacting Ramon or Alfred regarding this associate. Let me know if you have
any questions.

Thanks,
Julie

———————

**This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom they are addressed. If you have received this email in error destroy it immediately.**
**\*\*\* Walmart Confidential \*\*\***

Exhibit 6

**Archived:** Tuesday, April 17, 2012 2:27:56 PM
**From:** Redgrave, Vincent
**Sent:** Tuesday, April 19, 2011 2:45:28 PM
**To:** Alfred Viramontes
**Cc:** Hector Avalos; Hedges, Mark; Hugo A. Guerrero (Vendor); Sal Gutierrez (Vendor)
**Subject:** Abaristo Morales
**Importance:** Normal

Alfred,

As per our conversation I am letting you know that your lead (name above) will no longer be allowed back on site here at Mira Loma.

This is due to his unwillingness to follow the FSA / safe working practice procedures in setting up the work area appropriately.

Regards, Vince

**Vince Redgrave**

General Manager

Schneider Port Logistics

Mira Loma

redgravev@Schneider.com

Office: 951 360 5090

Cell: 951 903 6787

IMPACT 000774

Exhibit 7

1   DOUGLAS J. FARMER, CA Bar No. 139646
    douglas.farmer@ogletreedeakins.com
2   OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
3   Steuart Tower, Suite 1300
    One Market Plaza
4   San Francisco, California 94105
    Telephone:       (415) 442-4810
5   Facsimile:       (415) 442-4870

6   BETSY JOHNSON, CA Bar No. 119847
    betsy.johnson@ogletreedeakins.com
7   KIMBERLY C. CARTER, CA Bar No. 221283
    kimberly.carter@ogletreedeakins.com
8   TRUC T. NGUYEN, CA Bar No. 257262
    truc.nguyen@ogletreedeakins.com
9   OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    400 South Hope Street, Suite 1200
10  Los Angeles, CA 90071
    Telephone: 213.239.9800
11  Facsimile: 213.239.9045

12  Attorneys for Defendant
    SCHNEIDER LOGISTICS TRANSLOADING AND
13  DISTRIBUTION, INC.

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                    EASTERN DIVISION

17  EVERARDO CARRILLO;                  Case No. CV 11-08557 CAS (DTBx)
    FERNANDO CHAVEZ; ERIC
18  FLORES; JOSE MARTINEZ ARCEO;        DECLARATION OF VINCE
    BALTAZAR ZAVALA; AND JUAN           REDGRAVE IN SUPPORT OF
19  CHAVEZ, FOR THEMSELVES AND          DEFENDANT SCHNEIDER
    ALL OTHERS SIMILARLY                LOGISTICS TRANSLOADING AND
20  SITUATED AND THE GENERAL            DISTRIBUTION, INC.'S
    PUBLIC,                             OPPOSITION TO PLAINTIFFS'
21                                      APPLICATION FOR A
              Plaintiffs,               RESTRAINING ORDER AND
22                                      ORDER TO SHOW CAUSE RE:
         v.                             PRELIMINARY INJUNCTION
23                                      REQUIRING DEFENDANTS TO
    SCHNEIDER LOGISTICS, INC.;          KEEP AND DISCLOSE
24  SCHNEIDER LOGISTICS                 MANDATORY PAYROLL RECORDS
    TRANSLOADING AND
25  DISTRIBUTION, INC.; PREMIER
    WAREHOUSING VENTURES, LLC;
26  ROGERS-PREMIER UNLOADING            Complaint Filed: October 17, 2011
    SERVICES, LLC; IMPACT               Trial Date:      None Set
27  LOGISTICS, INC., AND DOES 1-15,     Judge:           Hon. Christina A.
                                                         Snyder, Presiding
28            Defendants.

    DECLARATION OF VINCE REDGRAVE IN SUPPORT OF DEFENDANT SLTD'S OPPOSITION

1

2               **DECLARATION OF VINCE REDGRAVE**

3        I, Vince Redgrave, declare and state as follows:

4        1.      I am employed by Schneider Logistics Transloading and Distribution,

5   Inc. ("SLTD"), a wholly owned subsidiary of Schneider Logistics, Inc ("SLI"). I

6   have held the position as the General Manager for SLTD since June 2010. I work at

7   the warehousing facility located in Mira Loma, California that is the subject of this

8   action ("Mira Loma warehouse facility").   I have personal knowledge of the matters

9   contained herein, and if called, would and could testify competently thereto.

10       2.      As the General Manager, I am responsible for site safety, key

11  performance indicator metrics ("KPI"), customer service and financial control.

12       3.      In my capacity as General Manager I am familiar with the SLTD

13  employees who are assigned to work at the Mira Loma warehouse facility.

14       4.      SLTD does not own or lease the Mira Loma warehouse facility.  The

15  property owner engages a third party vendor to service and maintain the break

16  rooms, bathrooms, parking lots, warehouse, dock area and other common areas.

17       5.      In addition to SLTD, there are several other vendors with operations at

18  the Mira Loma warehouse facility.  I am generally familiar with the operations of

19  these other vendors. SLTD has or has had business contracts with two of these

20  vendors, Defendants Premier Warehousing Ventures, LLC ("Premier ") and Impact

21  Logistics, Inc. ("Impact"). These vendor contracts provide for trailer and container

22  loading and unloading services at the Mira Loma warehouse facility. SLTD has no

23  employment or other agreements with workers of Premier or Impact.

24       6.      SLTD is engaged in the business of cross-docking, warehousing and

25  related services. SLTD provides internal warehousing operations at a warehousing

26  and transloading at the Mira Loma warehouse facility.

27       7.      SLTD contracts with Defendant Premier.  Under the contract,

28  Defendant Premier is responsible for providing trailer and container loading services

1   at the Mira Loma warehouse facility.

2   8.    SLTD contracts with Defendant Impact. Under the contract, Defendant

3   Impact is responsible for providing trailer and container unloading services at the

4   Mira Loma warehouse facility.

5   9.    The individuals employed by Defendant Premier ("Premier employees")

6   and the individuals employed by Defendant Impact ("Impact employees") perform

7   trailer and container loading and unloading functions at the Mira Loma warehouse

8   facility loading dock.

9   10.   The individuals employed by SLTD ("SLTD employees") assigned to

10   the Mira Loma warehouse facility perform warehouse functions such as order-filling,

11   ensuring inventory and freight accuracy, and other administrative support functions

12   such as data processing, traffic maintenance and office administration. SLTD

13   employees are primarily assigned to work areas located inside the Mira Loma

14   warehouse facility. These interior locations are distinct from the loading dock area,

15   where employees of other vendors at the facility are assigned to perform loading and

16   unloading duties.

17   11.   SLTD does not pay the Defendant Premier and Defendant Impact

18   employees assigned to the Mira Loma warehouse facility. SLTD pays either

19   Defendant Premier or Defendant Impact for the services these companies provide at

20   the Mira Loma warehouse facility.

21   12.   A review of our payroll records indicate that a Juan Chavez was

22   employed by SLTD from January 2006 until July 29, 2009. However, on

23   information and belief, it does not appear that this is the same individual as one of

24   the named Plaintiffs, but instead a different individual with the same name.

25   13.   To the best of my knowledge and belief, none of the named plaintiffs,

26   Everardo Carrillo, Fernando Chavez, Eric Flores, Jose Martinez Arceo,

27   Baltazar Zavala or Juan Chavez ("Named Plaintiffs"), persons submitting

28   declarations in support of Plaintiff's Application ("Declarants"), or any named

2

1    supervisors or other individuals mentioned in declarations submitted in

2    support of Plaintiffs' Application have ever been employed by SLTD in any

3    capacity at the Mira Loma warehouse facility.

4         14.    None of the Named Plaintiffs, Declarants or individuals mentioned

5    in declarations submitted in support of Plaintiffs' Application have ever made

6    a request to me for information regarding the manner in which they are or

7    were paid, copies of payroll records, copies or information regarding their

8    hours worked, information regarding their production records and/or paystubs

9    or itemized wage statements.

10        15.    I do not and have never had any verified information that any of the

11   Named Plaintiffs, Declarants, or any named supervisors or other individuals

12   mentioned in declarations submitted in support of Plaintiffs' Application are or

13   were employed by Defendant Premier and/or Impact.

14        16.    None of Defendant Premier employees performed work assigned to

15   SLTD employees at the Mira Loma warehouse facility.

16        17.    No SLTD employees performed work assigned to Defendant Premier

17   employees assigned to the Mira Loma warehouse facility.

18        18.    Under the contract, Defendant Premier is the sole and legal employer of

19   the employees it assigned to the Mira Loma warehouse facility.

20        19.    Under the contract, Defendant Premier is solely responsible for the

21   supervision of its employees at the Mira Loma warehouse facility. Defendant

22   Premier has never asked SLTD to supervise any Defendant Premier employees at the

23   Mira Loma warehouse facility. As such, at no time has SLTD or SLTD's employees

24   supervised any Defendant Premier employees at the Mira Loma warehouse facility.

25        20.    Under the contract, Defendant Premier is and has been solely

26   responsible for determining the rate of pay for all of its employees working at the

27   Mira Loma warehouse facility. Defendant Premier has never consulted with SLTD in

28   the determination of the rate of pay for Defendant Premier employees working at the

1   Mira Loma warehouse facility. Likewise, Defendant Premier has never asked SLTD

2   to determine or participate in determining the rate of pay for Defendant Premier

3   employees working at the Mira Loma warehouse facility. As such, SLTD has never

4   determined or participated in determining the rate of pay for Defendant Premier

5   employees working at the Mira Loma warehouse facility

6        21.    Under the contract, Defendant Premier is and has been solely

7   responsible for determining the method of pay (e.g., by the hour, piece rate, or

8   combination of both) for all of its employees working at the Mira Loma warehouse

9   facility. Defendant Premier has never consulted with SLTD in the determination of

10   method of pay (e.g., by the hour, piece rate, or combination of both) for any

11   Defendant Premier employees working at the Mira Loma warehouse facility.

12   Likewise, Defendant Premier has never asked SLTD to determine or participate in

13   determining the method of pay (e.g., by the hour, piece rate, or combination of both)

14   for any Defendant Premier employees working at the Mira Loma warehouse facility.

15   As such, SLTD has never determined or participated in determining the method of

16   pay (e.g., by the hour, piece rate, or combination of both) for Defendant Premier

17   employees working at the Mira Loma warehouse facility.

18        22.    Under the contract, Defendant Premier is and has been solely

19   responsible for recording and keeping track of hours worked by employees it

20   assigned to the Mira Loma warehouse facility for payroll and compensation

21   purposes. Defendant Premier has never asked SLTD to record or keep track of hours

22   worked by Defendant Premier employees at the Mira Loma warehouse facility for

23   payroll and compensation purposes.

24        23.    Defendant Premier employees do not record and have never recorded

25   their hours in SLTD's timekeeping system for payroll and compensation purposes.

26   For a limited time period from February 2009 to January 2010, the hours worked by

27   Defendant Premier employees were collected through SLTD's timekeeping system

28   and aggregated for statistical purposes. The data collected was not linked to SLTD's

1  payroll and recordkeeping system but was instead transferred to a production report
2  spreadsheet.

3      24.    SLTD has never calculated and withheld any payroll taxes and
4  deductions for Defendant Premier employees at the Mira Loma warehouse facility.

5      25.    SLTD has never provided worker's compensation coverage and
6  unemployment insurance coverage for Defendant Premier employees at the Mira
7  Loma warehouse facility

8      26.    SLTD is not in possession and has never in possession of any records,
9  files, data, or personnel information relating to Defendant Premier employees
10 assigned to the Mira Loma warehouse facility.

11     27.    SLTD is not in possession, and has never been in possession of any
12 records, files, data, or relating to any work production records for Defendant
13 Premier employees assigned to the Mira Loma warehouse facility.

14     28.    SLTD is not in possession of, and has never been in possession of any
15 information regarding the method of compensation paid (e.g., an hourly rate of pay,
16 piece rate, or combination of both) to any Defendant Premier employees assigned to
17 the Mira Loma warehouse facility

18     29.    SLTD is not in possession of, and has never been in possession of any
19 information regarding the piece rate plans or other methods of pay allegedly used by
20 Defendant Premier to pay Defendant Premier employees assigned to the Mira Loma
21 warehouse facility.

22     30.    SLTD is not in possession of, and has never been in possession of, any
23 information regarding the formulas Defendant Premier allegedly used for the piece
24 rate plans to pay Defendant Premier employees assigned to the Mira Loma
25 warehouse facility.

26     31.    SLTD is not in possession of and has never been in possession of any
27 information regarding the work schedules of Defendant Premier employees assigned
28 to the Mira Loma warehouse facility.

DECLARATION OF VINCE REDGRAVE IN SUPPORT OF DEFENDANT SLTD'S OPPOSITION

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 68 of 78   Page ID
#:4968
Case 2:11-cv-08557-CAS-DTB   Document 56   Filed 11/04/11   Page 7 of 13   Page ID #:922

32.    Defendant Premier solely determines and has solely determined the work schedules for all of its employees at the Mira Loma warehouse facility. Defendant Premier has never asked SLTD to determine the work schedules for any Defendant Premier employees at the Mira Loma warehouse facility. Further, Defendant Premier has never consulted with SLTD in the determination of work schedules for any Defendant Premier employees at the Mira Loma warehouse facility. As such, SLTD does not determine and has never determined the work schedules for any Defendant Premier employees assigned to the Mira Loma warehouse facility.

33.    Defendant Premier solely determines and has solely determined the productivity goals and standards for all of its employees at the Mira Loma warehouse facility. Defendant Premier has never asked SLTD to determine the productivity goals and standards for any Defendant Premier employees at the Mira Loma warehouse facility. Further, Defendant Premier has never consulted with SLTD in the determination of the productivity goals and standards for any Defendant Premier employees at the Mira Loma warehouse facility. As such, SLTD does not and has never determined the productivity goals and standards for any Defendant Premier employees at the Mira Loma warehouse facility.

34.    Under the contract, Defendant Premier is solely responsible for providing and did provide on-site, day-to-day supervision or direction to the employees it assigned to the Mira Loma warehouse facility. Defendant Premier has never asked SLTD to provide day-to-day supervision or direction to any Defendant Premier employees at the Mira Loma warehouse facility. Further, Defendant Premier has never consulted with SLTD in the provision of on-site, day-to-day supervision or direction to any Defendant Premier employees at the Mira Loma warehouse facility. As such, SLTD does not provide and has never provided day-to-day supervision to any Defendant Premier employees at the Mira Loma warehouse facility.

35.    Under the contract, Defendant Premier is solely responsible for

6

1  assigning work to all of its employees at the Mira Loma warehouse facility.

2  Defendant Premier has never asked SLTD to assign work to any Defendant Premier

3  employees at the Mira Loma warehouse facility. Further, Defendant Premier has

4  never consulted with SLTD in the assignment of work to any Defendant Premier

5  employees at the Mira Loma warehouse facility. As such, SLTD does not assign and

6  has never assigned work to any Defendant Premier employees at the Mira Loma

7  warehouse facility.

8      36.    No SLTD employees performed work assigned to Defendant Impact

9  employees assigned to the Mira Loma warehouse facility.

10      37.    None of Defendant Impact employees performed work assigned to

11  SLTD employees at the Mira Loma warehouse facility.

12      38.    Under the contract, Defendant Impact is the sole and legal employer of

13  the employees it assigned to the Mira Loma warehouse facility.

14      39.    Under the contract, Defendant Impact is solely responsible for assigning

15  its workers to work at the Mira Loma warehouse facility. Defendant Impact does not

16  consult with SLTD in the assignment of Defendant Impact's workers to work at the

17  Mira Loma warehouse facility. Likewise, Defendant Impact does not ask SLTD to

18  assign any of Defendant Impact's workers to work at the Mira Loma warehouse

19  facility.

20      40.    Under the contract, Defendant Impact is solely responsible for the

21  supervision of its employees at the Mira Loma warehouse facility. Defendant Impact

22  has never asked SLTD to supervise any Defendant Impact employees at the Mira

23  Loma warehouse facility. As such, at no time has SLTD or SLTD's employees

24  supervised any Defendant Impact employees at the Mira Loma warehouse facility.

25      41.    Under the contract, Defendant Impact is and has been solely responsible

26  for determining the rate of pay for all of its employees working at the Mira Loma

27  warehouse facility. Defendant Impact has never consulted with SLTD in the

28  determination of the rate of pay for Defendant Impact employees working at the

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 70 of 78   Page ID
#:4970
Case 2:11-cv-08557-CAS-DTB   Document 56   Filed 11/04/11   Page 9 of 13   Page ID #:924

1   Mira Loma warehouse facility. Likewise, Defendant Impact has never asked SLTD

2   to determine or participate in determining the rate of pay for Defendant Impact

3   employees working at the Mira Loma warehouse facility. As such, SLTD has never

4   determined or participated in determining the rate of pay for Defendant Impact

5   employees working at the Mira Loma warehouse facility

6          42.    Under the contract, Defendant Impact is and has been solely responsible

7   for determining the method of pay (e.g., by the hour, piece rate, or combination of

8   both) for all of its employees working at the Mira Loma warehouse facility.

9   Defendant Impact has never consulted with SLTD in the determination of method of

10  pay (e.g., by the hour, piece rate, or combination of both) for any Defendant Impact

11  employees working at the Mira Loma warehouse facility. Likewise, Defendant

12  Impact has never asked SLTD to determine or participate in determining the method

13  of pay (e.g., by the hour, piece rate, or combination of both) for any Defendant

14  Impact employees working at the Mira Loma warehouse facility. As such, SLTD has

15  never determined or participated in determining the method of pay (e.g., by the hour,

16  piece rate, or combination of both) for Defendant Impact employees working at the

17  Mira Loma warehouse facility.

18         43.    Under the contract, Defendant Impact is and has been solely responsible

19  for recording and keeping track of hours worked by employees it assigned to the

20  Mira Loma warehouse facility. Defendant Impact has never asked SLTD to record or

21  keep track of hours worked by Defendant Impact employees at the Mira Loma

22  warehouse facility. As such, SLTD has never recorded or kept track of hour worked

23  by Defendant Impact employees at the Mira Loma warehouse facility.

24         44.    Under the contract, Defendant Impact is and has been solely responsible

25  for calculating and withholding all payroll taxes and deductions for the employees it

26  assigned to the Mira Loma warehouse facility.  Defendant Impact has never asked

27  SLTD to calculate and withhold any payroll taxes and deductions for Defendant

28  Impact employees at the Mira Loma warehouse facility. As such, SLTD has never

1 | calculated and withheld any payroll taxes and deductions for Defendant Impact

2 | employees at the Mira Loma warehouse facility.

3 |     45.    Under the contract, Defendant Impact is and has been solely responsible

4 | for providing worker's compensation coverage and unemployment insurance

5 | coverage for the employees it assigned to the Mira Loma warehouse facility.

6 | Defendant Impact has never asked SLTD to provide worker's compensation

7 | coverage and unemployment insurance coverage for Defendant Impact employees at

8 | the Mira Loma warehouse facility. As such, SLTD has never provided worker's

9 | compensation coverage and unemployment insurance coverage for Defendant Impact

10 | employees at the Mira Loma warehouse facility

11 |     46.    SLTD is not in possession and has never in possession of any records,

12 | files, data, or personnel information relating to Defendant Impact employees

13 | assigned to the Mira Loma warehouse facility.

14 |     47.    SLTD is not in possession, and has never been in possession of any

15 | records, files, data, or relating to any work production records for Defendant

16 | Impact employees assigned to the Mira Loma warehouse facility.

17 |     48.    SLTD is not in possession and has never had possession of any

18 | information regarding the number of hours worked by Defendant Impact employees

19 | during their employment with Defendant Impact.

20 |     49.    Defendant Impact employees do not record and have never recorded

21 | their hours in SLTD's timekeeping system.

22 |     50.    SLTD is not in possession of, and has never been in possession of any

23 | information regarding the method of compensation paid (e.g., an hourly rate of pay,

24 | piece rate, or combination of both) to any Defendant Impact employees assigned to

25 | the Mira Loma warehouse facility

26 |     51.    SLTD is not in possession of, and has never been in possession of any

27 | information regarding the piece rate plans or other methods of pay allegedly used by

28 | Defendant Impact to pay Defendant Impact employees assigned to the Mira Loma

1   warehouse facility.

2       52.    SLTD is not in possession of, and has never been in possession of, any

3   information regarding the formulas Defendant Impact allegedly used for the piece

4   rate plans to pay Defendant Impact employees assigned to the Mira Loma

5   warehouse facility.

6       53.    SLTD is not in possession of and has never been in possession of any

7   information regarding the work schedules of Defendant Impact employees assigned

8   to the Mira Loma warehouse facility.

9       54.    Defendant Impact solely determines and has solely determined the work

10  schedules for all of its employees at the Mira Loma warehouse facility. Defendant

11  Impact has never asked SLTD to determine the work schedules for any Defendant

12  Impact employees at the Mira Loma warehouse facility. Further, Defendant Impact

13  has never consulted with SLTD in the determination of work schedules for any

14  Defendant Impact employees at the Mira Loma warehouse facility. As such, SLTD

15  does not determine and has never determined the work schedules for any

16  Defendant Impact employees assigned to the Mira Loma warehouse facility.

17      55.    Defendant Impact solely determines and has solely determined the

18  productivity goals and standards for all of its employees at the Mira Loma warehouse

19  facility. Defendant Impact has never asked SLTD to determine the productivity goals

20  and standards for any Defendant Impact employees at the Mira Loma warehouse

21  facility. Further, Defendant Impact has never consulted with SLTD in the

22  determination of the productivity goals and standards for any Defendant Impact

23  employees at the Mira Loma warehouse facility. As such, SLTD does not and has

24  never determined the productivity goals and standards for any Defendant Impact

25  employees at the Mira Loma warehouse facility.

26      56.    Under the contract, Defendant Impact is solely responsible for providing

27  and did provide on-site, day-to-day supervision or direction to the employees it

28  assigned to the Mira Loma warehouse facility. Defendant Impact has never asked

Case 2:11-cv-08557-CAS-DTB   Document 254-1   Filed 06/07/12   Page 73 of 78   Page ID
#:4973
Case 2:11-cv-08557-CAS-DTB   Document 56   Filed 11/04/11   Page 12 of 13   Page ID #:927

1    SLTD to provide day-to-day supervision or direction to any Defendant Impact

2    employees at the Mira Loma warehouse facility. Further, Defendant Impact has

3    never consulted with SLTD in the provision of on-site, day-to-day supervision or

4    direction to any Defendant Impact employees at the Mira Loma warehouse facility.

5    As such, SLTD does not provide and has never provided day-to-day supervision to

6    any Defendant Impact employees at the Mira Loma warehouse facility.

7         57.   Defendant Impact solely assigns and has solely assigned work to all of

8    its employees at the Mira Loma warehouse facility. Defendant Impact has never

9    asked SLTD to assign work to any Defendant Impact employees at the Mira Loma

10   warehouse facility. Further, Defendant Impact has never consulted with SLTD in the

11   assignment of work to any Defendant Impact employees at the Mira Loma

12   warehouse facility. As such, SLTD does not assign and has never assigned work to

13   any Defendant Impact employees at the Mira Loma warehouse facility

14        58.   SLTD supervisors provide Defendant Premier's and Defendant Impact's

15   supervisors with a daily delivery schedule and keep Defendant Premier's and

16   Defendant Impact's supervisors apprised of overall quality control and productivity

17   regarding the loading and unloading of containers by Defendant Premier and

18   Defendant Impact at the Mira Loma warehouse facility.

19        59.   In sum, pursuant to the express terms of the respective contracts

20   between SLTD and Defendants Impact and Premier, Defendants Impact and Premier

21   have agreed to be solely responsible for all payroll, timekeeping, record keeping, and

22   human resources functions for their respective employees at the Mira Loma

23   warehouse facility.  SLTD is not responsible for providing Premier or Impact

24   employees with itemized wage statements, for recording actual hours worked by

25   Premier or Impact employees or for identifying and recording hours during the day

26   when their employees may not be engaged in loading or unloading trailers and

27   containers.

28        60.   Specifically Defendants Impact and Premier, not SLTD, are

DECLARATION OF VINCE REDGRAVE IN SUPPORT OF DEFENDANT SLTD'S OPPOSITION

1 | contractually responsible for providing their respective employees with itemized
2 | wage statements which include all of the information necessary for their employees
3 | to calculate their pay, for recording their employees' actual hours worked, for
4 | recording dates when their employees reported to work but may have been furnished
5 | with less than half of their usual or scheduled workday, and for identifying and
6 | recording hours during the day when their employees may not have been engaged in
7 | loading or unloading containers and trailers.

8 |      61.   SLTD has not received a written notice by certified mail from Plaintiffs
9 | which includes the specific provisions of the Private Attorney General Act of 2004
10 | ("PAGA") that Plaintiffs have alleged were violated.

11 |      62.   In June 2011, the California Department of Industrial Relations,
12 | Division of Labor Standards Enforcement ("DLSE") requested an inspection of
13 | SLTD's payroll records for SLTD employees at the Mira Loma warehouse facility.
14 | SLTD made these records available to the DLSE. The DLSE did not issue any
15 | citation against SLTD relating to the payroll and time records for SLTD employees
16 | at the Mira Loma warehouse facility. On or about October 12, 2011, the DLSE
17 | conducted an on-site inspection at the Mira Loma facility. The DLSE did not issue
18 | any citations to SLTD for any record-keeping violations under Wage Order No. 9 or
19 | for any violations of the Labor Code or Wage Orders. Moreover, DLSE has never
20 | cited SLTD for any record-keeping violations under Wage Order No. 9 or for any
21 | violations of the Labor Code or Wage Orders.

22 |      I declare under penalty of perjury under the laws of the state of California that
23 | the foregoing is true and correct, and that this Declaration is executed on the _4_ th
24 | day of ~~October~~ November, 2011, at 10:33 a.m., California.

25 |
26 |                              _Vince Redgrave_
27 |                              VINCE REDGRAVE
28 |

# Exhibit 8

Nos. 12-55042, 12-55386

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Schneider Logistics, Inc. and Schneider Logistics Transloading and Distribution, Inc.,
*Defendants-Appellants*

vs.

Everardo Carrillo, Fernando Chavez, Eric Flores, Jose Martinez Arceo, Baltazar Zvala and Juan Chavez,
*Plaintiffs-Appellees.*

---

On Appeal From the United States District Court for the
Central District of California
The Honorable Christina Snyder
U.S.D.C. Case No. CV 11-08557 CAS (DTBx)

---

**APPELLANT SCHNEIDER LOGISTICS, INC.'S AND SCHNEIDER LOGISTICS TRANSLOADING AND DISTRIBUTION, INC.'S**

**OPENING BRIEF**

---

Douglas J. Farmer
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Steuart Tower, Suite 1300
One Market Plaza
San Francisco, California 94105
Telephone:  (415) 442-4810
Facsimile:   (415) 442-4870

Betsy Johnson
Alec Hillbo
Truc T. Nguyen
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone: (213) 239-9800
Facsimile:  (213) 239-9045

Attorneys for Defendants-Appellants Schneider Logistics, Inc. and Schneider Logistics Transloading and Distribution, Inc.

Applying *Martinez*, the district court erred in two ways. First, the evidence supports the conclusion that SLTD and SLI did not control working conditions. SLTD and SLI exercise no control over Appellees' wages, hours, or working conditions in that they have never determined rate of pay or method of pay or any other payroll function for any of Appellees. (V AER 844, ¶¶ 28-29; V AER 852-53, 856-57, ¶¶ 20-21, 41-42) Additionally, they have never determined the work schedules of Appellees or supervised or assigned work to any of these individuals. (V AER 852, 855-56, 859-60, ¶¶ 19, 32, 34-35, 39-40, 54, 56-57) Likewise, Appellees did not come forward with any evidence that SLTD ever allowed the PWV and Impact employees to suffer or, or permitted them to work, because there is no evidence showing Appellants have the power to cause them to work or prevent them from working. (V AER 845-45, 847, ¶¶ 36-39, 43; V AER 852, 855-56, 859-60, ¶¶ 17-18, 32, 34-37, 39, 53-55, 59)

Second, applying *Martinez*, the district court's reliance on the labor services contracts also was erroneous. The contracts do not provide SLTD or SLI with the power to hire, discipline, or terminate the Appellees' employment. Nor do SLTD or SLI pay the workers' wages. These critical omissions demonstrate that SLTD and SLI do not control the working conditions. *See Martinez*, 49 Cal. 4th at 70, 77.

In conclusion, the district court erred in relying on only Appellees' declarations and immaterial sections of the service contracts to conclude that SLTD and SLI exercise direct and indirect control over the workers' working conditions.

### 3.    The District Court Has Wrongly Enjoined SLI

The district court has continued to find that SLI, as SLTD's parent corporation, is a joint employer and subject to the preliminary injunctions. The mere fact that SLI is SLTD's parent is insufficient for joint employer liability. *See*

substantive rights – employment with SLTD – until Appellees had established the full merits of their case.

Finally, the district court's entry of a preliminary injunction restraining retaliation by a non-employer who took no adverse actions simply makes no sense and must be reversed.

Respectfully submitted,

DATED:  March 26, 2012

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: ___/s/ Alec Hillbo_____
    Douglas J. Farmer
    Betsy Johnson
    Alec Hillbo
    Truc T. Nguyen

Attorneys for Defendants-Appellants Schneider Logistics, Inc. and Scheneider Logistics Transloading and Distribution, Inc.

36